GLIDDEN COMPANY *v.* ZDANOK ET AL.

No. 242.   Argued February 21, 26, 1962.—Decided June 25, 1962.*

*Chester Bordeau* argued the cause for petitioner in No. 242.   With him on the briefs was *William P. Smith.*

*Morris Shapiro* argued the cause for respondents in No. 242.   With him on the briefs was *Harry Katz.*

*Solicitor General Cox* argued the cause for the United States, as intervenor, in No. 242.   With him on the brief were *Assistant Attorney General Miller, Oscar H. Davis* and *Philip R. Monahan.*

By special leave of Court, 368 U. S. 973, *Francis M. Shea* argued the cause in No. 242 for the Chief Judge and Associate Judges of the United States Court of Claims, as *amici curiae,* urging affirmance.   With him on the briefs was *Richard T. Conway.*

Briefs of *amici curiae,* in support of the petition in No. 242, were filed by *William B. Barton* for the Chamber of Commerce of the United States; *John E. Branch* for the Georgia State Chamber of Commerce; *Henry E. Seyfarth* for the Illinois State Chamber of Commerce;

---

*Together with No. 481, *Lurk* v. *United States,* on certiorari to the United States Court of Appeals for the District of Columbia Circuit, argued February 21, 1962.

*Edward C. First, Jr.* and *Gilbert Nurick* for the Pennsylvania State Chamber of Commerce; *Frank C. Heath* for the Chamber of Commerce of the City of Cleveland, Ohio; *Charles H. Tuttle* for the American Spice Trade Association; *Carl M. Gould* for the California Manufacturers Association; *Ashley Sellers* and *Jesse E. Baskette* for the National Association of Margarine Manufacturers; and *Daniel S. Ring* for the National Paint, Varnish and Lacquer Association, Inc.

*Eugene Gressman* argued the cause and filed briefs for petitioner in No. 481.

*Solicitor General Cox* argued the cause for the United States in No. 481. With him on the brief were *Assistant Attorney General Miller, Oscar H. Davis, Beatrice Rosenberg* and *Philip R. Monahan.*

By special leave of Court, *Roger Robb* argued the cause and filed a brief in No. 481 for the Chief Judge and Associate Judges of the United States Court of Customs and Patent Appeals, as *amici curiae,* urging affirmance.

MR. JUSTICE HARLAN announced the judgment of the Court and an opinion joined by MR. JUSTICE BRENNAN and MR. JUSTICE STEWART.

In *Ex parte Bakelite Corp.,* 279 U. S. 438, and *Williams* v. *United States,* 289 U. S. 553, this Court held that the United States Court of Customs and Patent Appeals and the United States Court of Claims were neither confined in jurisdiction nor protected in independence by Article III of the Constitution, but that both had been created by virtue of other, substantive, powers possessed by Congress under Article I. The Congress has since pronounced its disagreement by providing as to each that "such court is hereby declared to be a court established under article III of the Constitution of the United

States."[1] The petitioners in these cases invite us to reaffirm the authority of our earlier decisions, and thus hold for naught these congressional pronouncements, at least as sought to be applied to judges appointed prior to their enactment.

No. 242 is a suit brought by individual employees in a New York state court to recover damages for breach of a collective bargaining agreement, and removed to the Federal District Court for the Southern District of New York by the defendant employer on the ground of diversity of citizenship. The employees' right to recover was sustained by a divided panel of the Court of Appeals, in an opinion by Judge J. Warren Madden, then an active judge of the Court of Claims sitting by designation of the Chief Justice of the United States under 28 U. S. C. § 293 (a).[2] No. 481 is a criminal prosecution instituted in the United States District Court for the District of Columbia and resulting in a conviction for armed robbery. The trial was presided over by Judge Joseph R. Jackson, a retired judge of the Court of Customs and Patent Appeals sitting by similar designation.[3] The petitioner's application for leave to appeal to the Court of Appeals

---

[1] Act of July 28, 1953, § 1, 67 Stat. 226, added to 28 U. S. C. § 171 (Court of Claims); Act of August 25, 1958, § 1, 72 Stat. 848, added to 28 U. S. C. § 211 (Court of Customs and Patent Appeals). See also Act of July 14, 1956, § 1, 70 Stat. 532, added to 28 U. S. C. § 251 (Customs Court).

[2] "The Chief Justice of the United States may designate and assign temporarily any judge of the Court of Claims or the Court of Customs and Patent Appeals . . . to perform judicial duties in any circuit, either in a court of appeals or district court, upon presentation of a certificate of necessity by the chief judge or circuit justice of the circuit wherein the need arises."

[3] 28 U. S. C. § 294 (d) authorizes assignment of a retired judge from either court to "perform such judicial duties as he is willing and able to undertake" in any circuit.

*in forma pauperis,* respecting the validity of this designation and alleged trial errors, was upheld by this Court last Term, 366 U. S. 712; we are now asked to review the Court of Appeals' affirmance of his conviction. Because of the significance of the "designation" issue for the federal judicial system, we granted certiorari in the two cases, 368 U. S. 814, 815, limited to the question whether the judgment in either was vitiated by the respective participation of the judges named.[4]

The claim advanced by the petitioners, that they were denied the protection of judges with tenure and compensation guaranteed by Article III, has nothing to do with the manner in which either of these judges conducted himself in these proceedings. No contention is made that either Judge Madden or Judge Jackson displayed a lack of appropriate judicial independence, or that either sought by his rulings to curry favor with Congress or the Executive. Both indeed enjoy statutory assurance of tenure and compensation,[5] and were it not for the explicit provisions of Article III we should be quite unable to say that either judge's participation even colorably denied the petitioners independent judicial hearings.

Article III, § 1, however, is explicit and gives the petitioners a basis for complaint without requiring them to point to particular instances of mistreatment in the record. It provides:

> "The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior

[4] The petition in No. 481 sought certiorari only as to that issue.

[5] 10 Stat. 612 (1855), as amended, 28 U. S. C. § 173 (Court of Claims); 46 Stat. 590, 762 (1930), as amended, 28 U. S. C. § 213 (Court of Customs and Patent Appeals). Judge Madden was appointed in 1941, Brief for Petitioner in No. 242, pp. 7–8, and retired in 1961, 290 F. 2d xvi; Judge Jackson was appointed in 1937, Brief for Petitioner in No. 481, pp. 9–10, and retired in 1952, 193 F. 2d xv.

Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." [6]

Apart from this provision, it is settled that neither the tenure nor salary of federal officers is constitutionally protected from impairment by Congress. *Crenshaw* v. *United States,* 134 U. S. 99, 107–108; cf. *Butler* v. *Pennsylvania,* 10 How. 402, 416–418. The statutory declaration, therefore, that the judges of these two courts should serve during good behavior and with undiminished salary, see note 5, *supra,* was ineffective to bind any subsequent Congress unless those judges were invested at appointment with the protections of Article III. *United States* v. *Fisher,* 109 U. S. 143, 145; see *McAllister* v. *United States,* 141 U. S. 174, 186. And the petitioners naturally point to the *Bakelite* and *Williams* cases, *supra,* as establishing that no such constitutional protection was in fact conferred.

The distinction referred to in those cases between "constitutional" and "legislative" courts has been productive of much confusion and controversy. Because of the highly theoretical nature of the problem in its present context,[7] we would be well advised to decide these cases on narrower grounds if any are fairly available. But for reasons that follow, we find ourselves unable to do so.

---

[6] The bearing of § 2 of Art. III on petitioners' claims is discussed later. *Infra,* pp. 562–583.

[7] The abstractness of the present controversy is graphically demonstrated by the disparity in volume between records and briefs. The records in both cases amount to but 66 pages of motions, opinions, and the like, with no relevant transcripts of proceedings, while the briefs extend to 533 pages exclusive of appendices.

## I.

No challenge to the authority of the judges was filed in the course of the proceedings before them in either case. The Solicitor General, who submitted briefs and arguments for the United States, has seized upon this circumstance to suggest that the petitioners should be precluded by the so-called *de facto* doctrine from questioning the validity of these designations for the first time on appeal.

Whatever may be the rule when a judge's authority is challenged at the earliest practicable moment, as it was in *United States* v. *American-Foreign S. S. Corp.,* 363 U. S. 685, in other circumstances involving judicial authority this Court has described it as well settled "that where there is an office to be filled and one acting under color of authority fills the office and discharges its duties, his actions are those of an officer *de facto* and binding upon the public." *McDowell* v. *United States,* 159 U. S. 596, 602. The rule is founded upon an obviously sound policy of preventing litigants from abiding the outcome of a lawsuit and then overturning it if adverse upon a technicality of which they were previously aware. Although a United States Attorney may be permitted on behalf of the public to upset an order issued upon defective authority, *Frad* v. *Kelly,* 302 U. S. 312, a private litigant ordinarily may not. *Ball* v. *United States,* 140 U. S. 118, 128–129.

The rule does not obtain, of course, when the alleged defect of authority operates also as a limitation on this Court's appellate jurisdiction. *Ayrshire Collieries Corp.* v. *United States,* 331 U. S. 132 (three-judge court); *United States* v. *Emholt,* 105 U. S. 414 (certificate of divided opinion). In other circumstances as well, when the statute claimed to restrict authority is not merely technical

but embodies a strong policy concerning the proper administration of judicial business, this Court has treated the alleged defect as "jurisdictional" and agreed to consider it on direct review even though not raised at the earliest practicable opportunity. *E. g., American Construction Co.* v. *Jacksonville, T. & K. W. R. Co.*, 148 U. S. 372, 387–388.

*A fortiori* is this so when the challenge is based upon nonfrivolous constitutional grounds. In *McDowell* v. *United States* itself, *supra*, at 598–599, the Court, while holding that any defect in statutory authorization for a particular intracircuit assignment was immunized from examination by the *de facto* doctrine, specifically passed upon and upheld the constitutional authority of Congress to provide for such an assignment. And in *Lamar* v. *United States*, 241 U. S. 103, 117–118, the claim that an intercircuit assignment violated the criminal venue restrictions of the Sixth Amendment and usurped the presidential appointing power under Art. II, § 2, was heard here and determined upon its merits, despite the fact that it had not been raised in the District Court or in the Court of Appeals or even in this Court until the filing of a supplemental brief upon a second request for review.

The alleged defect of authority here relates to basic constitutional protections designed in part for the benefit of litigants. See *O'Donoghue* v. *United States*, 289 U. S. 516, 532–534. It should be examinable at least on direct review, where its consideration encounters none of the objections associated with the principle of *res judicata*, that there be an end to litigation. At the most is weighed in opposition the disruption to sound appellate process entailed by entertaining objections not raised below, and that is plainly insufficient to overcome the strong interest of the federal judiciary in maintaining the constitutional plan of separation of powers. So this Court has con-

cluded on an analogous balance struck to protect against intruding federal jurisdiction into the area constitutionally reserved to the States: Whether diversity of citizenship exists may be questioned on direct review for the first time in this Court. *Mansfield, C. & L. M. R. Co.* v. *Swan,* 111 U. S. 379, 382; *City of Gainesville* v. *Brown-Crummer Investment Co.,* 277 U. S. 54, 59. We hold that it is similarly open to these petitioners to challenge the constitutional authority of the judges below.

## II.

The Court of Appeals for the District of Columbia found it unnecessary to reach the question whether Judge Jackson enjoyed constitutional security of tenure and compensation. It held that even if he did not, Congress might authorize his assignment to courts in the District of Columbia, by virtue of its power "To exercise exclusive Legislation in all Cases whatsoever" over the District. Art. I, § 8, cl. 17. The Solicitor General, in support of that ruling, argues here that because the criminal charge against petitioner Lurk was violation of a local statute, D. C. Code, 1961, § 22-2901, rather than of one national in application, its trial did not require the assignment of an Article III judge.

The question thus raised is itself of constitutional dimension, and one which we need not reach if an Article III judge was in fact assigned. In the companion case, No. 242, the necessity for such a judge is uncontested. The Court of Appeals for the Second Circuit sat to determine a question of state contract law presented for its decision solely by reason of the diverse citizenship of the litigants.[8] Authority for the Federal Government to

---

[8] Under our limited writ of certiorari, 368 U. S. 814, we have no occasion to consider whether federal law was more appropriately the measure of the employer's obligation. Cf. *Teamsters Local 174* v. *Lucas Flour Co.,* 369 U. S. 95.

decide questions of state law exists only by virtue of the Diversity Clause in Article III. *Erie R. Co.* v. *Tompkins,* 304 U. S. 64; see *Murray's Lessee* v. *Hoboken Land & Improvement Co.,* 18 How. 272 284. For this reason, the question whether Judge Madden enjoyed constitutional independence is inescapably presented. Since decision of that question involves considerations bearing directly upon the constitutional status of Judge Jackson, we deem it appropriate to dispose of both cases on the same grounds, without at present intimating any view as to the correctness of the holding below by the Court of Appeals for the District of Columbia.

## III.

The next question is whether the character of the judges who sat in these cases may be determined without reference to the character of the courts to which they were originally appointed. If it were plain that these judges were invested upon confirmation with Article III tenure and compensation, it would be unnecessary for present purposes to consider the constitutional status of the Court of Claims and the Court of Customs and Patent Appeals.

No such course, however, appears to be open. The statutes under which Judge Madden and Judge Jackson were appointed speak of service only on those courts. 28 U. S. C. §§ 171, 211. They were not, as were the judges selected for the late Commerce Court, appointed as "additional circuit judges," Act of June 18, 1910, c. 309, 36 Stat. 539, 540, whose tenure might be constitutionally secured regardless of the fortunes of their courts. See 50 Cong. Rec. 5409–5418 (1913); *Donegan* v. *Dyson,* 269 U. S. 49; Frankfurter and Landis, The Business of the Supreme Court (1927), 168–173. It is true that at the time of Judge Jackson's appointment there was in force a statute authorizing assignment of Court of Customs and Patent Appeals judges to serve on the courts of the

District of Columbia. Act of September 14, 1922, c. 306, § 5, 42 Stat. 837, 839. At that time, however, before the *O'Donoghue* decision, there seems to have been a consensus that the courts of the District were not confined or protected by Article III; as late as 1930, this Court regarded it as "recognized that the courts of the District of Columbia are not created under the judiciary article of the Constitution but are legislative courts . . . ." *Federal Radio Comm'n* v. *General Electric Co.,* 281 U. S. 464, 468; and see Katz, Federal Legislative Courts, 43 Harv. L. Rev. 894, 899–903 (1930). The 1922 Act cannot therefore be viewed *ex proprio vigore* as conferring Article III status on judges subsequently appointed to the Court of Customs and Patent Appeals.[9]

A more novel suggestion is that the assignment statute itself, 28 U. S. C. §§ 291–296, authorized the Chief Justice to appoint inferior Article III judges in the course of designating them for service on Article III courts.[10] See Shartel, Federal Judges—Appointment, Supervision, and Removal—Some Possibilities under the Constitution, 28 Mich. L. Rev. 485 (1930); cf. *Ex parte Siebold,* 100 U. S. 371, 397–398; *Rice* v. *Ames,* 180 U. S. 371, 378. But we need not consider the constitutional questions involved in this suggestion, for the statute does not readily lend itself

---

[9] The debates and reports in Congress display no awareness of the problem. See H. R. Rep. No. 1152, 67th Cong., 2d Sess. (1922); 62 Cong. Rec. 190–191, 207–209 (1921).

[10] Article II, § 2, cl. 2 of the Constitution provides that the President

". . . shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

to such a construction. If nothing else, the authority given the Chief Justice in 28 U. S. C. § 295 to revoke assignments previously made is wholly inconsistent with a reading of the statute as empowering him to appoint inferior Article III judges. Judges assigned by the Chief Justice who are not previously endowed with constitutional security of tenure and compensation thus can gain nothing by the designation.[11]

It is significant that Congress did not enact the present broad assignment statute until after it had declared the Court of Claims and the Court of Customs and Patent Appeals to be constitutional courts. Act of August 25, 1958, 72 Stat. 848. A major purpose of these declarations was to eliminate uncertainty whether regular Article III judges might be assigned to assist in the business of those courts when disability or disqualification made it difficult for them to obtain a quorum.[12] Those doubts, suggested by dicta in *Ex parte Bakelite Corp.*, 279 U. S. 438, 460, would be expanded rather than allayed were we to hold that the judges of the Court of Claims and the Court of Customs and Patent Appeals enjoy the protections of Article III while leaving at large the *status* of those courts. For these various reasons, the constitutional quality of tenure and compensation extended

---

[11] Compare the statute creating the Emergency Court of Appeals, to consist of three or more judges "designated by the Chief Justice of the United States from judges of the United States district courts and circuit courts of appeals." Act of January 30, 1942, c. 26, § 204 (c), 56 Stat. 23, 32.

[12] Hearings on H. R. 1070 before Subcommittee No. 2 of the House Committee on the Judiciary, pp. 6–7, 24 (Unpublished, May 19, 1953; on file with the Clerk of the Committee) (testimony of Judge Howell of the Court of Claims); H. R. Rep. No. 695, 83d Cong., 1st Sess. 2, 5–6 (1953); S. Rep. No. 275, 83d Cong., 1st Sess. 2 (1953); H. R. Rep. No. 2349, 85th Cong., 2d Sess. (1958); S. Rep. No. 2309, 85th Cong., 2d Sess. (1958); 104 Cong. Rec. 16095 (1958) (remarks of Representative Keating).

Judges Madden and Jackson at the time of their confirmation must be deemed to have depended upon the constitutional status of the courts to which they were primarily appointed.

## IV.

In determining the constitutional character of the Court of Claims and the Court of Customs and Patent Appeals, as we are thus led to do, we may not disregard Congress' declaration that they were created under Article III. Of course, Congress may not by fiat overturn the constitutional decisions of this Court, but the legislative history of the 1953 and 1958 declarations makes plain that it was far from attempting any such thing. Typical is a statement in the 1958 House Report that the purpose of the legislation was to "declare which of the powers Congress was intending to exercise when the court was created." H. R. Rep. No. 2349, 85th Cong., 2d Sess. 3 (1958); accord, H. R. Rep. No. 695, 83d Cong., 1st Sess. 3, 5, 7 (1953); and see S. Rep. No. 275, 83d Cong., 1st Sess. 2 (1953), substituted for S. Rep. No. 261, 83d Cong., 1st Sess. 2 (1953); 99 Cong. Rec. 8943, 8944 (1953) (remarks of Senator Gore).

"Subsequent legislation which declares the intent of an earlier law," this Court has noted, "is not, of course, conclusive in determining what the previous Congress meant. But the later law is entitled to weight when it comes to the problem of construction." *Federal Housing Administration* v. *Darlington, Inc.,* 358 U. S. 84, 90; accord, *New York, P. & N. R. Co.* v. *Peninsula Exchange,* 240 U. S. 34, 39. Especially is this so when the Congress has been stimulated by decisions of this Court to investigate the historical materials involved and has drawn from them a contrary conclusion. *United States* v. *Hutcheson,* 312 U. S. 219, 235–237. As examination of the House and Senate Reports makes evident, that is what occurred

here. *E. g.,* S. Rep. No. 2309, 85th Cong., 2d Sess. 2–3 (1958); H. R. Rep. No. 695, 83d Cong., 1st Sess. 3–5 (1953).

At the time when *Bakelite* and *Williams* were decided, the Court did not have the benefit of this congressional understanding. The *Williams* case, for example, arose under the Legislative Appropriation Act of June 30, 1932, c. 314, § 107 (a)(5), 47 Stat. 382, 402, which reduced the salary of all judges "except judges whose compensation may not, under the Constitution, be diminished during their continuance in office." Mr. Justice Sutherland, who wrote the Court's opinions in both *Williams* and *O'Donoghue,* was plainly disadvantaged by the absence of congressional intimation as to which judges of which courts were to be deemed exempted. See *O'Donoghue* v. *United States,* 289 U. S. 516, 529.

In the *Bakelite* case, to be sure, Mr. Justice Van Devanter said of an argument drawn from tenuous evidence of congressional understanding that it "mistakenly assumes that whether a court is of one class or the other depends on the intention of Congress, whereas the true test lies in the power under which the court was created and in the jurisdiction conferred." 279 U. S., at 459. Yet he would hardly have denied that explicit evidence of legislative intendment concerning the factors he thought controlling may be relevant and indeed highly persuasive. In any event, the *Bakelite* dictum did not embarrass the Court in deciding *O'Donoghue,* where it looked searchingly at "congressional practice" to determine what classification that body "recognizes." 289 U. S., at 548–550. We think the forthright statement of understanding embraced in the 1953 and 1958 declarations may be taken as similarly persuasive evidence for the problem now before us.

To give due weight to these congressional declarations is not of course to compromise the authority or responsi-

bility of this Court as the ultimate expositor of the Constitution. The *Bakelite* and *Williams* decisions have long been considered of questionable soundness. See, *e. g.,* Brown, The Rent in Our Judicial Armor, 10 G. W. L. Rev. 127 (1941); Hart and Wechsler, The Federal Courts and the Federal System (1953), 348–351; 1 Moore, Federal Practice (2d ed. 1961), 71 n. 21. They stand uneasily next to *O'Donoghue*, much of whose reasoning in sustaining the Article III status of the District of Columbia superior courts seems applicable to the Court of Claims and the Court of Customs and Patent Appeals. In *Pope* v. *United States,* 323 U. S. 1, 13–14, where the Solicitor General argued at length against the continued vitality of *Bakelite* and *Williams,* their authority was regarded as an open question.

Furthermore, apart from this Court's considered practice not to apply *stare decisis* as rigidly in constitutional as in nonconstitutional cases, *e. g., United States* v. *South Buffalo R. Co.,* 333 U. S. 771, 774–775; see *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 405–408 and n. 1–3 (Brandeis, J., dissenting), there is the fact that Congress has acted on its understanding and has provided for assignment of judges who have made decisions that are now said to be impeachable. In these circumstances, the practical consideration underlying the doctrine of *stare decisis*—protection of generated expectations—actually militates in favor of reexamining the decisions. We are well-advised, therefore, to regard the questions decided in those cases as entirely open to reconsideration.

## V.

The Constitution nowhere makes reference to "legislative courts." The power given Congress in Art. I, § 8, cl. 9, "To constitute Tribunals inferior to the supreme Court," plainly relates to the "inferior Courts" provided for in Art. III, § 1; it has never been relied on for establishment of any other tribunals.

The concept of a legislative court derives from the opinion of Chief Justice Marshall in *American Insurance Co.* v. *Canter,* 1 Pet. 511, dealing with courts established in a territory. A cargo of cotton salvaged from a wreck off the coast of Florida had been purchased by Canter at a judicial sale ordered by a court at Key West invested by the territorial legislature with jurisdiction over cases of salvage. The insurers, to whom the property in the cargo had been abandoned by the owners, brought a libel for restitution, claiming in part that the prior decree was void because not rendered in a court created by Congress, as required for the exercise of admiralty jurisdiction under Article III. Chief Justice Marshall for the Court swept this objection aside by noting that the Superior Courts of Florida, which had been created by Congress, were staffed with judges appointed for only four years, and concluded that Article III did not apply in the territories:

> "These Courts, then, are not constitutional Courts, in which the judicial power conferred by the Constitution on the general government, can be deposited. They are incapable of receiving it. They are legislative Courts, created in virtue of the general right of sovereignty which exists in the government, or in virtue of that clause which enables Congress to make all needful rules and regulations, respecting the territory belonging to the United States." 1 Pet., at 546.

By these arresting observations the Chief Justice certainly did not mean to imply that the case heard by the Key West court was not one of admiralty jurisdiction otherwise properly justiciable in a Federal District Court sitting in one of the States. Elsewhere in the opinion he distinctly referred to the provisions of Article III to show that it was such a case. 1 Pet., at 545. All the Chief Justice meant, and what the case has ever after been

taken to establish, is that in the territories cases and controversies falling within the enumeration of Article III may be heard and decided in courts constituted without regard to the limitations of that article; [13] courts, that is, having judges of limited tenure and entertaining business beyond the range of conventional cases and controversies.

The reasons for this are not difficult to appreciate so long as the character of the early territories and some of the practical problems arising from their administration are kept in mind. The entire governmental responsibility in a territory where there was no state government to assume the burden of local regulation devolved upon the National Government. This meant that courts had to be established and staffed with sufficient judges to handle the general jurisdiction that elsewhere would have been exercised in large part by the courts of a State.[14] But when the territories began entering into statehood, as they soon did, the authority of the territorial courts over matters of state concern ceased; and in a time when the size of the federal judiciary was still relatively small, that left the National Government with a significant

---

[13] Far from being "incapable of receiving" federal-question jurisdiction, the territorial courts have long exercised a jurisdiction commensurate in this regard with that of the regular federal courts and have been subjected to the appellate jurisdiction of this Court precisely because they do so. *Benner v. Porter*, 9 How. 235, 243; *Clinton v. Englebrecht*, 13 Wall. 434, 447; *Reynolds v. United States*, 98 U. S. 145, 154; *United States v. Coe*, 155 U. S. 76, 86; *Balzac v. Porto Rico*, 258 U. S. 298, 312–313; *International Longshoremen's Union v. Juneau Spruce Corp.*, 342 U. S. 237, 240–241; cf. *Martin v. Hunter's Lessee*, 1 Wheat. 304, 338; see *Pope v. United States*, 323 U. S. 1, 13–14.

[14] Under *Barber v. Barber*, 21 How. 582, 584, for example, the federal courts in the States were incompetent to render divorces; but in the territories, where the legislative power of the United States of necessity extended to all such local matters, the territorial courts took cognizance of them. *Simms v. Simms*, 175 U. S. 162, 167–168; *De la Rama v. De la Rama*, 201 U. S. 303.

546

number of territorial judges on its hands and no place to put them. When Florida was admitted as a State, for example, Congress replaced three territorial courts of general jurisdiction comprising five judges with one Federal District Court and one judge.[15]

At the same time as the absence of a federal structure in the territories produced problems not foreseen by the Framers of Article III, the realities of territorial government typically made it less urgent that judges there enjoy the independence from Congress and the President envisioned by that article. For the territories were not ruled immediately from Washington; in a day of poor roads and slow mails, it was unthinkable that they should be. Rather, Congress left municipal law to be developed largely by the territorial legislatures, within the framework of organic acts and subject to a retained power of veto.[16] The scope of self-government exercised under these delegations was nearly as broad as that enjoyed by the States, and the freedom of the territories to dispense with protections deemed inherent in a separation of governmental powers was as fully recognized.[17]

Against this historical background, it is hardly surprising that Chief Justice Marshall decided as he did. It would have been doctrinaire in the extreme to deny the right of Congress to invest judges of its creation with authority to dispose of the judicial business of the territories. It would have been at least as dogmatic, having recognized the right, to fasten on those judges a guarantee

---

[15] *Benner* v. *Porter,* 9 How. 235, 240, 244. For statutory techniques since developed to avoid the interregnal problems involved in that case, see *Metlakatla Indian Community* v. *Egan,* 363 U. S. 555, 557–559; 1 Moore, Federal Practice (2d ed. 1961), 32–34.

[16] See *Clinton* v. *Englebrecht,* 13 Wall. 434, 441–445; *Hornbuckle* v. *Toombs,* 18 Wall. 648, 655–656.

[17] Compare *Clinton* v. *Englebrecht, supra,* 13 Wall., at 446, 447, with *Dreyer* v. *Illinois,* 187 U. S. 71, 83–84.

of tenure that Congress could not put to use and that the exigencies of the territories did not require. Marshall chose neither course; conscious as ever of his responsibility to see the Constitution work, he recognized a greater flexibility in Congress to deal with problems arising outside the normal context of a federal system.

The same confluence of practical considerations that dictated the result in *Canter* has governed the decision in later cases sanctioning the creation of other courts with judges of limited tenure. In *United States* v. *Coe,* 155 U. S. 76, 85–86, for example, the Court sustained the authority of the Court of Private Land Claims to adjudicate claims under treaties to land in the territories, but left it expressly open whether such a course might be followed within the States. The Choctaw and Chickasaw Citizenship Court was similarly created to determine questions of tribal membership relevant to property claims within Indian territory under the exclusive control of the National Government. See *Stephens* v. *Cherokee Nation,* 174 U. S. 445; *Ex parte Joins,* 191 U. S. 93; *Wallace* v. *Adams,* 204 U. S. 415. Upon like considerations, Article III has been viewed as inapplicable to courts created in unincorporated territories outside the mainland, *Downes* v. *Bidwell,* 182 U. S. 244, 266–267; *Balzac* v. *Porto Rico,* 258 U. S. 298, 312–313; cf. *Dorr* v. *United States,* 195 U. S. 138, 145, 149, and to the consular courts established by concessions from foreign countries, *In re Ross,* 140 U. S. 453, 464–465, 480.[18]

The touchstone of decision in all these cases has been the need to exercise the jurisdiction then and there and for a transitory period. Whether constitutional limitations on the exercise of judicial power have been held inapplicable has depended on the particular local setting,

---

[18] See generally, as to each of these courts, 1 Moore, Federal Practice (2d ed. 1961), 40–44, 47–50.

the practical necessities, and the possible alternatives. When the peculiar reasons justifying investiture of judges with limited tenure have not been present, the *Canter* holding has not been deemed controlling. *O'Donoghue* v. *United States*, 289 U. S. 516, 536–539.

Since the conditions obtaining in one territory have been assumed to exist in each, this Court has in the past entertained a presumption that even those territorial judges who have been extended statutory assurances of life tenure and undiminished compensation have been so favored as a matter of legislative grace and not of constitutional compulsion. *McAllister* v. *United States*, 141 U. S. 174, 186.[19] By a parity of reasoning, however, the presumption should be reversed when Congress creates courts the continuing exercise of whose jurisdiction is unembarrassed by such practical difficulties. See *Mookini* v. *United States*, 303 U. S. 201, 205. As the *Bakelite* and *Williams* opinions recognize, the Court of Claims and the Court of Customs and Patent Appeals were created to carry into effect powers enjoyed by the National Government over subject matter—roughly, payment of debts and collection of customs revenue—and not over localities. What those opinions fail to deal with is whether that distinction deprives *American Insurance Co.* v. *Canter* of controlling force.

The *Bakelite* opinion did not inquire whether there might be such a distinction. After sketching the history of the territorial and consular courts, it continued at once:

"Legislative courts also may be created as special tribunals to examine and determine various matters,

---

[19] We do not now decide, of course, whether the same conditions still obtain in each of the present-day territories or whether, even if they do, Congress might not choose to establish an Article III court in one or more of them.

arising between the government and others, which from their nature do not require judicial determination and yet are susceptible of it." 279 U. S., at 451. Since in the Court's view the jurisdiction conferred on both the Court of Claims and the Court of Customs and Patent Appeals included "nothing which inherently or necessarily requires judicial determination," [20] both could have been and were created as legislative courts.

We need not pause to assess the Court's characterization of the jurisdiction conferred on those courts, beyond indicating certain reservations about its accuracy.[21] Nor need we now explore the extent to which Congress may commit the execution of even "inherently" judicial business to tribunals other than Article III courts. We may and do assume, for present purposes, that none of the jurisdiction vested in our two courts is of that sort, so that all of it might be committed for final determination to non-Article III tribunals, be they denominated legislative courts or administrative agencies.

But because Congress may employ such tribunals assuredly does not mean that it must. This is the crucial

---

[20] *Ex parte Bakelite Corp.*, 279 U. S. 438, 453, 458; accord, *Williams* v. *United States*, 289 U. S. 553, 579.

[21] *Williams* itself recognized that the jurisdiction conferred on the Court of Claims by the Tucker Act, now 28 U. S. C. § 1491, to award just compensation for a governmental taking, empowered that court to decide what had previously been described as a judicial and not a legislative question. 289 U. S., at 581; see, *e. g., Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 327. As for *Bakelite*, its reliance, 279 U. S., at 458 n. 26, on *Cary* v. *Curtis*, 3 How. 236, for the proposition that disputes over customs duties may be adjudged summarily without recourse to judicial proceedings, appears to have overlooked the care with which that decision specifically declined to rule whether all right of action might be taken away from a protestant, even going so far as to suggest several judicial remedies that might have been available. See 3 How., at 250.

*non sequitur* of the *Bakelite* and *Williams* opinions.
Each assumed that because Congress might have assigned
specified jurisdiction to an administrative agency, it must
be deemed to have done so even though it assigned that
jurisdiction to a tribunal having every appearance of a
court and composed of judges enjoying statutory assur-
ances of life tenure and undiminished compensation.  In
so doing, each appears to have misunderstood the thrust
of the celebrated observation by Mr. Justice Curtis, that

> ". . . there are matters, involving public rights,
> which may be presented in such form that the judi-
> cial power is capable of acting on them, and which
> are susceptible of judicial determination, but which
> congress may or may not bring within the cognizance
> of the courts of the United States, as it may deem
> proper." *Murray's Lessee* v. *Hoboken Land &
> Improvement Co.,* 18 How. 272, 284.

This passage, cited in both the *Bakelite* and *Williams*
opinions,[22] plainly did not mean that the matters referred
to could not be entrusted to Article III courts.  Quite the
contrary, the explicit predicate to Justice Curtis' argu-
ment was that such courts could exercise judicial power
over such cases.  For the very statute whose authoriza-
tion of summary distress proceedings was sustained in the
*Murray* case, also authorized the distrainee to bring suit
to arrest the levy against the United States in a Federal
District Court.  And as to this, the author of the opinion
stated, just before his more trenchant remark quoted
above:

> "The United States consents that this fact of
> indebtedness may be drawn in question by a suit
> against them.  Though they might have withheld

---

[22] 279 U. S., at 451 n. 8; 289 U. S., at 579.

their consent, we think that, by granting it, nothing which may not be a subject of judicial cognizance is brought before the court." [23]

Thus *Murray's Lessee*, far from furnishing authority against the proposition that the Court of Claims is a constitutional court, actually supports it.

To deny that Congress may create tribunals under Article III for the sole purpose of adjudicating matters that it might have reserved for legislative or executive decision would be to deprive it of the very choice that Mr. Justice Curtis insisted it enjoys. Of course possession of the choice, assuming it is coextensive with the range of matters confided to the courts,[24] subjects those courts to the continuous possibility that their entire jurisdiction may be withdrawn. See *Williams* v. *United States,* 289 U. S. 553, 580–581. But the threat thus facing their independence is not in kind or effect different from that sustained by all inferior federal courts. The great constitutional compromise that resulted in agreement upon Art. III, § 1, authorized but did not obligate Congress to create inferior federal courts. I Farrand, The Records of the Federal Convention (1911), 118, 124–125; The Federalist, No. 81 (Wright ed. 1961), at 509 (Hamilton). Once created, they passed almost a century without exercising any very significant jurisdiction. Warren, New Light on the History of the Federal Judiciary Act of 1789, 37 Harv. L. Rev. 49, 65–70 (1923); Frankfurter, Distribution of Judicial Power Between United States and State Courts, 13 Cornell L. Q. 499 (1928). Throughout this period and beyond it up to today, they remained constantly subject to jurisdictional curtailment. *Turner* v. *Bank of North America,* 4 Dall. 8, 10 note (Chase, J.);

---

[23] 18 How., at 284.
[24] But see note 21, *supra*.

552

*Cary* v. *Curtis*, 3 How. 236, 245; *Sheldon* v. *Sill*, 8 How. 441, 449; *Kline* v. *Burke Construction Co.*, 260 U. S. 226, 233–234. Even if it should be conceded that the Court of Claims or the Court of Customs and Patent Appeals is any more likely to be supplanted, we do not think the factor of constitutional significance.[25]

What has been said should suffice to demonstrate that whether a tribunal is to be recognized as one created under Article III depends basically upon whether its establishing legislation complies with the limitations of that article; whether, in other words, its business is the federal business there specified and its judges and judgments are allowed the independence. there expressly or impliedly made requisite. To ascertain whether the courts now under inquiry can meet those tests, we must turn to examine their history, the development of their functions, and their present characteristics.

## VI.

A. *Court of Claims.*—The Court of Claims was created by the Act of February 24, 1855, c. 122, 10 Stat. 612, primarily to relieve the pressure on Congress caused by the volume of private bills. As an innovation the court was at first regarded as an experiment, and some of its creators were reluctant to give it all the attributes of a court by making its judgments final; instead it was authorized to hear claims and report its findings of fact and opinions to Congress, together with drafts of bills designed to carry its recommendations into effect. § 7, 10 Stat. 613; see Cong. Globe, 33d Cong., 2d Sess. 70–72 (1854) (remarks of Senators Brodhead and Hunter). From the outset, however, a majority of the court's proponents insisted that its judges be given life tenure as a means of assuring inde-

---

[25] See generally Hart and Wechsler, The Federal Courts and the Federal System (1953), 312–340, and more specifically, pp. 567–568, *infra.*

pendence of judgment, and their proposal won acceptance in the Act. § 1, 10 Stat. 612; see Cong. Globe, 33d Cong., 2d Sess. 71, 108–109 (Senator Hunter); 72 (Senator Clayton); 106 (Senator Brodhead); 110 (Senator Pratt); 114, 902 (the votes). Indeed there are substantial indications in the debates that Congress thought it was establishing a court under Article III. Cong. Globe, 33d Cong., 2d Sess. 108–109 (Senator Hunter); 110–111 (Senator Pratt); 111 (Senator Clayton); 113 (Senators Stuart and Douglas).

By the end of 1861, however, it was apparent that the limited powers conferred on the court were insufficient to relieve Congress from the laborious necessity of examining the merits of private bills. In his State of the Union message that year, President Lincoln recommended that the legislative design to provide for the independent adjudication of claims against the United States be brought to fruition by making the judgments of the Court of Claims final. The pertinent text of his address is as follows, Cong. Globe, 37th Cong., 2d Sess., Appendix, p. 2:

"It is as much the duty of Government to render prompt justice against itself, in favor of citizens, as it is to administer the same between private individuals. The investigation and adjudication of claims, in their nature belong to the judicial department . . . . It was intended by the organization of the Court of Claims mainly to remove this branch of business from the Halls of Congress; but while the court has proved to be an effective and valuable means of investigation, it in great degree fails to effect the object of its creation, for want of power to make its judgments final."

By the Act of March 3, 1863, c. 92, § 5, 12 Stat. 765, 766, Congress adopted the President's recommendation and made the court's judgments final, with appeal to the

Supreme Court provided in certain cases. The signifi-
cance of this nearly contemporaneous enactment for the
light it sheds on the aims of the 1855 Congress is apparent.

There was one further impediment. Section 14 of the
1863 Act, 12 Stat. 768, provided that "no money shall be
paid out of the treasury for any claim passed upon by the
court of claims till after an appropriation therefor shall
be estimated for by the Secretary of the Treasury." In
*Gordon* v. *United States,* 2 Wall. 561, this Court refused
to review a judgment of the Court of Claims because it
construed that section as giving the Secretary a revisory
authority over the court inconsistent with its exercise of
judicial power. Congress promptly repealed the offensive
section, Act of March 17, 1866, c. 19, § 1, 14 Stat. 9, once
again exhibiting its purpose to liberate the Court of
Claims from itself and the Executive. Thereafter, the
Supreme Court promulgated rules governing appeals from
the court, 3 Wall. vii–viii, and took jurisdiction under
them for the first time in *De Groot* v. *United States,*
5 Wall. 419.

The early appeals entertained by the Court furnish
striking evidence of its understanding that the Court of
Claims had been vested with judicial power. In *De Groot*
the court had been given jurisdiction by special bill only
after the passage of two private bills had failed to produce
agreement by administrative officials upon adequate
recompense. This Court was thus presented with a vivid
illustration of the ways in which the same matter might
be submitted for resolution to a legislative committee, to
an executive officer, or to a court, *Murray's Lessee, supra,*
and nevertheless accepted appellate jurisdiction over
what was, necessarily, an exercise of the judicial power
which alone it may review. *Marbury* v. *Madison,*
1 Cranch 137, 174–175.

After the repeal of § 14, the Court was quick to protect
the Court of Claims' judgments from executive revision.

In *United States* v. *O'Grady,* 22 Wall. 641, a judgment had been diminished by the Secretary of the Treasury in an amount equal to a tax assertedly due, although the United States had not pleaded a set-off as it was entitled by the 1863 Act to do.[26] The Court of Claims and this Court on appeal held the deduction unwarranted in law, with the following pertinent closing observation:

> "Should it be suggested that the judgment in question was rendered in the Court of Claims, the answer to the suggestion is that the judgment of the Court of Claims, from which no appeal is taken, is just as conclusive under existing laws as the judgment of the Supreme Court, until it is set aside on a motion for a new trial." [27]

Like views abound in the early reports. In *United States* v. *Union Pacific R. Co.,* 98 U. S. 569, 603, for example, referring to Article III, the Court said:

> "Congress has, under this authority, created the district courts, the circuit courts, and the Court of Claims, and vested each of them with a defined portion of the judicial power found in the Constitution."

Such remained the view of the Court as late as *Miles* v. *Graham,* 268 U. S. 501, decided in 1925. There it was held, on the authority of *Evans* v. *Gore,* 253 U. S. 245, that the salary of a Court of Claims judge appointed even after enactment of the taxing statute in question was not subject to such diminution. Although the case was afterwards overruled on this point, *O'Malley* v. *Woodrough,* 307 U. S. 277, 283, what is of continuing interest is the

---

[26] § 3, 12 Stat. 765, now 28 U. S. C. § 1503. See also 18 Stat. 481 (1875), as amended, 31 U. S. C. § 227, requiring the Comptroller General to bring suit against a nonconsenting judgment creditor if that official believes a debt not previously asserted as a set-off is due the United States.

[27] 22 Wall., at 648.

556

Court's reliance in *Miles* upon *Evans* v. *Gore,* where Mr. Justice Van Devanter for the Court devoted six full pages to recitation of the importance of the guarantees of tenure and salary contained in Article III.[28] How it was possible to say in *Bakelite,* 279 U. S., at 455, that the Court in *Miles,* decided only five years after *Evans* and with copious quotation from it, was unaware of the crucial question whether Article III extended its protection to a judge of the Court of Claims, is very difficult to understand.

In actuality, the Court's pre-*Bakelite* view of the Court of Claims is supported by the evidence of increasing confidence placed in that tribunal by Congress. The Tucker Act, § 1, 24 Stat. 505 (1887), now 28 U. S. C. § 1491, greatly expanded the jurisdiction of the court by authorizing it to adjudicate

> "All claims founded upon the Constitution of the United States or any law of Congress, except for pensions, or upon any regulation of an Executive Department, or upon any contract, express or implied, with the Government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort, in respect of which claims the party would be entitled to redress against the United States either in a court of law, equity, or admiralty if the United States were suable . . . ."

All of the cases within this grant of jurisdiction arise either immediately or potentially under federal law within the meaning of Art. III, § 2. *Osborn* v. *Bank of the United States,* 9 Wheat. 738, 818–819, 823–825; see *Clearfield Trust Co.* v. *United States,* 318 U. S. 363; *Federal Crop Insurance Corp.* v. *Merrill,* 332 U. S. 380; Mishkin, The Federal "Question" in the District Courts, 53 Col. L. Rev. 157, 184–196. The cases heard by the Court have

---

[28] *Evans* v. *Gore,* 253 U. S. 245, 248–254.

been as intricate and far-ranging as any coming within the federal-question jurisdiction, 28 U. S. C. § 1331, of the District Courts. *E. g., Causby* v. *United States,* 104 Ct. Cl. 342, 60 F. Supp. 751, *remanded for further findings,* 328 U. S. 256 (eminent domain); *Lovett* v. *United States,* 104 Ct. Cl. 557, 66 F. Supp. 142, aff'd, 328 U. S. 303 (bill of attainder); *Shapiro* v. *United States,* 107 Ct. Cl. 650, 69 F. Supp. 205 (military due process). In none of these cases, nor in others, could it well be suggested that the Court of Claims had adjudged the issues, no matter how important to the Government, otherwise than dispassionately.

Indeed there is reason to believe that the Court of Claims has been constituted as it is precisely to the end that there may be a tribunal specially qualified to hold the Government to strict legal accounting. From the beginning it has been given jurisdiction only to award damages, not specific relief. *United States* v. *Alire,* 6 Wall. 573; *United States* v. *Jones,* 131 U. S. 1; see Schwartz and Jacoby, Government Litigation (tentative ed. 1960), 123–126. No question can be raised of Congress' freedom, consistently with Article III, to impose such a limitation upon the remedial powers of a federal court. *Lauf* v. *E. G. Shinner & Co.,* 303 U. S. 323, 330 (Norris-LaGuardia Act). But far from serving as a restriction, this limitation has allowed the Court of Claims a greater freedom than is enjoyed by other federal courts to inquire into the legality of governmental action. See *Larson* v. *Domestic & Foreign Commerce Corp.,* 337 U. S. 682, 703–704; *Malone* v. *Bowdoin,* 369 U. S. 643; Brenner, Judicial Review by Money Judgment in the Court of Claims, 21 Fed. B. J. 179 (1961).

"If there are such things as political axioms," said Alexander Hamilton, "the propriety of the judicial power of a government being coextensive with its legislative, may be ranked among the number." The Federalist,

No. 80 (Wright ed. 1961), at 500. His sentiments were not ignored by the Framers of Article III. The Randolph plan, which formed the basis of that article, called for establishment of a national judiciary coextensive in authority with the executive and legislative branches. IV Farrand, The Records of the Federal Convention (rev. ed. 1937), 47–48. For, as Hamilton observed, a chief defect of the Confederation had been ". . . the want of a judiciary power. Laws are a dead letter without courts to expound and define their true meaning and operation." The Federalist, No. 22 (Wright ed. 1961), at 197. But because of the barrier of sovereign immunity, the laws controlling governmental rights and obligations could not for years obtain a fully definitive exposition. The creation of the Court of Claims can be viewed as a fulfillment of the design of Article III.

B. *The Court of Customs and Patent Appeals.*—The Court of Customs Appeals, as it was first known, was established by § 29 of the Customs Administrative Act of 1890, c. 407, 26 Stat. 131, as added by § 28 of the Payne-Aldrich Tariff Act of August 5, 1909, c. 6, 36 Stat. 11, 105, to review by appeal final decisions of the Board of General Appraisers (now Customs Court) respecting the classification and rate of duty applicable to imported merchandise. The Act was silent about the tenure of the judges, as had been the Judiciary Act of 1789, c. 20, §§ 3, 4, 1 Stat. 73–75. The salary, first set at $10,000, was afterwards lowered to the $7,000 then being paid to circuit judges, Act of February 25, 1910, c. 62, § 1, 36 Stat. 202, 214, but before the first nominations had been received or confirmed, see 45 Cong. Rec. 2959, 4003 (1910); and, although it has since been increased, it has never been diminished.[29] After the *Bakelite* case had

[29] Under the Legislative Appropriation Act of June 30, 1932, c. 314, 47 Stat. 382—the statute under which the *Williams* and *O'Donoghue* cases arose—the judges of the Court of Customs and Patent Appeals

been decided, Congress expressly conferred tenure during good behavior upon the court's judges, in the Tariff Act of 1930, § 646, 46 Stat. 590, 762. Representative Chindblom, in supporting the measure, stated that "when this court was established it was believed to be a constitutional court [so] that it was not necessary to fix the term." 71 Cong. Rec. 2043 (1929).

The debates in the Senate at the time of the court's creation bear out this observation. See 44 Cong. Rec. 4185–4225 (1909). For under the Customs Administrative Act of 1890, c. 407, § 15, 26 Stat. 131, 138, review of decisions of the Board of General Appraisers had been vested in the Circuit Courts, undoubted Article III courts; it was this jurisdiction that was proposed to be transferred to the new court.[30] The debates accordingly concerned themselves with whether there was a need for a specialized court in the federal judicial system to deal with customs matters.

As was said some 35 years ago, "an important phase of the history of the federal judiciary deals with the movement for the establishment of tribunals whose business was to be limited to litigation arising from a restricted

---

accepted a reduction in salary from $12,500 to $10,000. That court had not, however, been specified for reduction by Congress; the action of the judges was understandable coming as it did after *Bakelite* had been decided; and under § 109 of the Act, 47 Stat. 403, the Treasury was authorized to accept reductions in payment voluntarily tendered by judges whose salary was constitutionally exempt from diminution.

[30] 36 Stat. 106. Provision was made for the transfer of pending cases and of appeals from final decisions in and of the Circuit Courts and Courts of Appeals. 36 Stat. 106, 107. The very first case heard by the Court of Customs Appeals was an appeal from the Circuit Court for the Southern District of New York in *Hansen v. United States,* 1 Ct. Cust. App. 1; it also took jurisdiction of a case transferred from the Court of Appeals for the Ninth Circuit in *United States v. Seattle Brewing & Malting Co.,* 1 Ct. Cust. App. 362.

field of legislative control." Frankfurter and Landis, The Business of the Supreme Court (1927), 147. In certain areas of federal judicial business there has been a felt need to obtain, *first,* the special competence in complex, technical and important matters that comes from narrowly focused inquiry; *second,* the speedy resolution of controversies available on a docket unencumbered by other matters; and, *third,* the certainty and definition that come from nationwide uniformity of decision. See generally *id.,* at 146–186. Needs such as these provoked formation of the Commerce Court and the Emergency Court of Appeals. They also prompted establishment of the Court of Customs and Patent Appeals and its investiture with jurisdiction over customs, tariff, and patent and trademark litigation. 28 U. S. C. §§ 1541–1543.

The parallelism with the Commerce Court is especially striking. That court was created to exercise the jurisdiction previously held by the Circuit Courts to review orders of the Interstate Commerce Commission. Mann-Elkins Act of June 18, 1910, c. 309, 36 Stat. 539. It was needed, so its sponsors believed, to afford uniform, expert, and expeditious judicial review. See President Taft's message to Congress, 45 Cong. Rec. 379 (1910), in the course of which he stated:

"Reasons precisely analogous to those which induced the Congress to create the court of customs appeals by the provisions in the tariff act of August 5, 1909, may be urged in support of the creation of the commerce court."

When disfavor with the court caused its abolition three years later, Act of October 22, 1913, c. 32, 38 Stat. 208, 219, it was decided in Congress after extensive debate that the judges then serving on it were protected in tenure by Article III, and they were thereafter assigned to sit on

other constitutional courts.    See, *e. g.*, 48 Cong. Rec. 7994 (1912) (remarks of Senator Sutherland); and see *Donegan* v. *Dyson*, 269 U. S. 49.

The Emergency Court of Appeals was similarly created, by the Act of January 30, 1942, c. 26, 56 Stat. 23, to exercise exclusive equity jurisdiction to determine the validity of regulations, price schedules, and orders issued by the wartime Office of Price Administration.[31]    Its Article III status was recognized in *Lockerty* v. *Phillips*, 319 U. S. 182, 187–188.

Of course the judges of those courts were appointed as judges of inferior federal courts generally, or drawn from among those previously appointed as such.    See p. 538 and note 11, *supra*.    But by 1942 at least, when the latter court was created, Congress was well aware of the doubt created by the *Bakelite* and *Williams* decisions whether Article III judges could sit on non-Article III tribunals. Its action in authorizing judges of the District Courts and Courts of Appeals to sit on the Emergency Court thus reflects its understanding that that court was being created under Article III.

Such an understanding parallels that of previous Congresses since the adoption of the Constitution.    Congress has never been compelled to vest the entire jurisdiction provided for in Article III upon inferior courts of its creation; until 1875 it conferred very little of it indeed.    See pp. 551–552, *supra*.    The Court of Customs and Patent Appeals therefore fits harmoniously into the federal judicial system authorized by Article III.

---

[31] Its functions were continued under the Defense Production Act of 1950, c. 932, § 408, 64 Stat. 798, 808, to determine the validity of price and wage stabilization orders issued under that Act.    On April 18, 1962, after denial of certiorari in the last case on its docket, *Rosenzweig* v. *Boutin*, 369 U. S. 818, the court terminated its existence. 299 F. 2d 1–21.

562

## VII.

Article III, § 2 provides in part:

"The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; . . .— to Controversies to which the United States shall be a Party . . . ."

The cases heard by the Court of Claims and the Court of Customs and Patent Appeals all arise under federal law, as we have seen; they are also cases in which the United States is a party. But in *Williams* v. *United States,* 289 U. S. 553, 572–578, far from making of that circumstance a further proof that the Court of Claims exercises the judicial power contemplated by Article III, this Court held that it did not because that article, so it was said, does not make justiciable controversies to which the United States is a party *defendant.*

The Court's opinion dwelt in part upon the omission of the word "all" before "Controversies" in the clause referred to. To derive controlling significance from this semantic circumstance seems hardly to be faithful to John Marshall's admonition that "it is *a constitution* we are expounding." *McCulloch* v. *Maryland,* 4 Wheat. 316, 407. But it would be needlessly literal to suppose that the Court rested its holding on this point. Rather it deemed controlling the rule, "well settled and understood" at the time of the Constitutional Convention, that "the sovereign power is immune from suit." 289 U. S., at 573. Accordingly it becomes necessary to reconsider whether that principle has the effect claimed of rendering suits against the United States nonjusticiable in a court created under Article III.

At least one touchstone of justiciability to which this Court has frequently had reference is whether the action sought to be maintained is of a sort "recognized at the time of the Constitution to be traditionally within the power of courts in the English and American judicial systems." *United Steelworkers* v. *United States,* 361 U. S. 39, 44, 60 (FRANKFURTER, J., concurring). There can be little doubt that that test is met here. Suits against the English sovereign by petition of liberate, *monstrans de droit,* and other forms of action designed to gain redress against unlawful action of the Crown had been developed over several centuries and were well-established before the Revolution. See 9 Holdsworth, History of English Law, 7–45 (1926). Similar provisions for judicial remedies against themselves were made by the American States immediately after the Revolution. *E. g.,* 9 Laws of Va. 536, 540 (1778) (Hening 1821); see *Higginbotham's Executrix* v. *Commonwealth,* 25 Gratt. 627, 637– 638 (Va. 1874). This history was known by Congress when it established the Court of Claims, see Cong. Globe, 33d Cong., 2d Sess. 73 (1854) (remarks of Senator Pettit), and undoubtedly was familiar to the Framers of the Constitution, most of them lawyers.

Hamilton's views, quoted in the *Williams* case, 289 U. S., at 576, are not to the contrary. To be sure, Hamilton argued that "the contracts between a nation and individuals are only binding on the conscience of the sovereign, and have no pretensions to a compulsive force. They confer no right of action, independent of the sovereign will." The Federalist, No. 81 (Wright ed. 1961), at 511. But that is because there was no surrender of sovereign immunity in the plan of the convention; [32] so

---

[32] As there was, for example, in suits between States and by the United States against a State. *Rhode Island* v. *Massachusetts,* 12 Pet. 657, 720; *United States* v. *Texas,* 143 U. S. 621, 639–646.

that, for suits against the United States, it remained "inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent.*" *Ibid.* (Emphasis in original.) In this sense, and only in this sense, is Article III's extension of judicial competence over controversies to which the United States is a party ineffective to confer jurisdiction over suits to which it is a defendant. For "behind the words of the constitutional provisions are postulates which limit and control." *Monaco* v. *Mississippi,* 292 U. S. 313, 322. But once the consent is given, the postulate is satisfied, and there remains no barrier to justiciability. Cf. *Cohens* v. *Virginia,* 6 Wheat. 264, 383–385.

So the Court had given itself to understand before *Williams* was decided. In *United States* v. *Louisiana,* 123 U. S. 32, 35, it held maintainable under Article III a suit brought in the Court of Claims by a State against the United States with Congress' consent. And in *Minnesota* v. *Hitchcock,* 185 U. S. 373, 384, which reaffirmed that ruling, the Court said:

> "This, is a controversy to which the United States may be regarded as a party. It is one, therefore, to which the judicial power of the United States extends. It is, of course, under that clause a matter of indifference whether the United States is a party plaintiff or defendant."

Further in the same opinion, 185 U. S., at 386, the Court significantly remarked:

> "While the United States as a government may not be sued without its consent, yet with its consent it may be sued, and the judicial power of the United States extends to such a controversy. Indeed, the whole jurisdiction of the Court of Claims rests upon this proposition."

To deny that proposition now would be to call into question a large measure of the jurisdiction exercised by the United States District Courts. Under the Federal Tort Claims Act, § 410 (a), 60 Stat. 842, 843–844 (1946), as amended, 28 U. S. C. § 1346 (b), those courts have been empowered to determine the tort liability of the United States in suits brought by individual plaintiffs. In so doing, they exercise functions akin to those of the Court of Claims, as is evidenced by the statutory authorization of appeals to that court from their judgments, with the consent of the appellee. § 412 (a)(2), 60 Stat. 844–845 (1946), as amended, 28 U. S. C. § 1504.

In truth the District Courts have long been vested with substantial portions of the identical jurisdiction exercised by the Court of Claims. The Tucker Act, § 2, 24 Stat. 505 (1887), as amended, 28 U. S. C. § 1346 (a)(2), gives them concurrent jurisdiction over the suits it authorizes, when the amount in controversy is less than $10,000. Under that Act a District Court sits "as a court of claims," *United States* v. *Sherwood*, 312 U. S. 584, 591, and affords the same rights and privileges to suitors against the United States. *Bates Manufacturing Co.* v. *United States*, 303 U. S. 567, 571. See generally Schwartz and Jacoby, Government Litigation (tentative ed. 1960), 109–111.

There have been and are further statutory indications that Congress regards the two courts interchangeably. In 1921, Mr. Justice Brandeis compiled a list of 17 statutes passed during World War I, permitting suits against the United States for the value of property seized for use in the war effort, and authorizing them to be instituted in either the Court of Claims or one of the District Courts. *United States* v. *Pfitsch*, 256 U. S. 547, 553 n. 1. Today, 28 U. S. C. § 1500 gives litigants an election to sue the United States as principal in the Court of Claims or to

pursue their claims against its agents in any other court, including the District Courts. See *National Cored Forgings Co.* v. *United States,* 132 Ct. Cl. 11, 132 F. Supp. 454. In addition, by the Act of September 13, 1960, §§ 1, 2 (a), 74 Stat. 912, Congress added §§ 1406 (c) and 1506 to Title 28 of the United States Code, providing for transfer between the Court of Claims and any District Court when a suit within one court's exclusive jurisdiction is brought mistakenly in another.

These evidences of congressional understanding that suits against the United States are justiciable in courts created under Article III may not be lightly disregarded. Nevertheless it is probably true that Congress devotes a more lively attention to the work performed by the Court of Claims, and that it has been more prone to modify the jurisdiction assigned to that court. It remains to consider whether that circumstance suffices to render non-judicial the decision of claims against the United States in the Court of Claims.

*First.* Throughout its history the Court of Claims has frequently been given jurisdiction by special act to award recovery for breach of what would have been, on the part of an individual, at most a moral obligation. *E. g.,* 45 Stat. 602 (1928), as amended, 25 U. S. C. §§ 651–657; *Indians of California* v. *United States,* 98 Ct. Cl. 583, 599. Congress has waived the benefit of *res judicata, Cherokee Nation* v. *United States,* 270 U. S. 476, 486, and of defenses based on the passage of time, *United States* v. *Alcea Band of Tillamooks,* 329 U. S. 40, 45–46; *United States* v. *Central Eureka Mining Co.,* 357 U. S. 155.

In doing so, as this Court has uniformly held, Congress has enlisted the aid of judicial power whose exercise is amenable to appellate review here. *United States* v. *Alcea Band of Tillamooks, supra;* see *Colgate* v. *United States,* 280 U. S. 43, 47–48. Indeed the Court has held

that Congress may for reasons adequate to itself confer bounties upon persons and, by consenting to suit, convert their moral claim into a legal one enforceable by litigation in an undoubted constitutional court. *United States* v. *Realty Co.,* 163 U. S. 427.

The issue was settled beyond peradventure in *Pope* v. *United States,* 323 U. S. 1. There the Court held that for Congress to direct the Court of Claims to entertain a claim theretofore barred for any legal reason from recovery—as, for instance, by the statute of limitations, or because the contract had been drafted to exclude such claims—was to invoke the use of judicial power, notwithstanding that the task might involve no more than computation of the sum due. Consent judgments, the Court recalled, are nonetheless judicial judgments. See 323 U. S., at 12, and cases cited. After this decision it cannot be doubted that when Congress transmutes a moral obligation into a legal one by specially consenting to suit, it authorizes the tribunal that hears the case to perform a judicial function.

*Second.* Congress has on occasion withdrawn jurisdiction from the Court of Claims to proceed with the disposition of cases pending therein, and has been upheld in so doing by this Court. *E. g., District of Columbia* v. *Eslin,* 183 U. S. 62. But that is not incompatible with the possession of Article III judicial power by the tribunal affected. Congress has consistently with that article withdrawn the jurisdiction of this Court to proceed with a case then *sub judice, Ex parte McCardle,* 7 Wall. 506; its power can be no less when dealing with an inferior federal court, *In re Hall,* 167 U. S. 38, 42. For as Hamilton assured those of his contemporaries who were concerned about the reach of power that might be vested in a federal judiciary, "it ought to be recollected that the national legislature will have ample authority to make

such *exceptions,* and to prescribe such regulations as will be calculated to obviate or remove [any] . . . inconveniences." The Federalist, No. 80 (Wright ed. 1961), at 505.

The authority is not, of course, unlimited. In 1870, Congress purported to withdraw jurisdiction from the Court of Claims and from this Court on appeal over cases seeking indemnification for property captured during the Civil War, so far as eligibility therefor might be predicated upon an amnesty awarded by the President, as both courts had previously held that it might. Despite *Ex parte McCardle, supra,* the Court refused to apply the statute to a case in which the claimant had already been adjudged entitled to recover by the Court of Claims, calling it an unconstitutional attempt to invade the judicial province by prescribing a rule of decision in a pending case. *United States* v. *Klein,* 13 Wall. 128. Surely no such concern would have been manifested if it had not been thought that the Court of Claims was invested with judicial power.[33]

## VIII.

A more substantial question relating to the justiciability of money claims against the United States arises from the impotence of a court to enforce its judgments. It was Chief Justice Taney's opinion, in *Gordon* v. *United*

---

[33] *Pocono Pines Assembly Hotels Co.* v. *United States,* 73 Ct. Cl. 447, *leave to file petition for writ of mandamus or prohibition denied,* 285 U. S. 526, in which the Congress "remanded" a final and unappealed decision against the United States to the Court of Claims for new findings, does not detract from the authority of *Klein.* Without examining anything else, it is enough to note that the considerations governing a grant or denial of a petition for mandamus are, like those controlling the issuance of a writ of certiorari, so discretionary with the Court as to deprive a denial of precedential effect on this score. Compare Sup. Ct. Rule 30 with Rule 19 (1), (2), and cf. *Brown* v. *Allen,* 344 U. S. 443, 488, 491–492 (opinion of FRANKFURTER, J.).

*States,* afterwards published at 117 U. S. 697, 702, that the dependence of the Court of Claims upon an appropriation by Congress to carry its awards into effect negatived the possession of judicial power:

> "The award of execution is a part, and an essential part of every judgment passed by a court exercising judicial power."

But Taney's opinion was not the opinion of the Court. It was a memorandum of his views prepared before his death and circulated among, but not adopted by, his brethren. The opinion of the Court, correctly reported for the first time in *United States* v. *Jones,* 119 U. S. 477, 478, makes clear that its refusal to entertain the *Gordon* appeal rested solely on the revisory authority vested in the Secretary of the Treasury before the repeal of § 14. See also *United States* v. *Alire,* 6 Wall. 573, 576; *United States* v. *O'Grady,* 22 Wall. 641, 647; *Langford* v. *United States,* 101 U. S. 341, 344–345—in each of which the limitation of the *Gordon* decision to the difficulties caused by § 14 clearly appears.

Nevertheless the problem remains and should be considered. Its scope has, however, been reduced by the Act of July 27, 1956, § 1302, 70 Stat. 678, 694, 31 U. S. C. § 724a, a general appropriation act which eliminates the need for subsequent separate appropriations to pay judgments below $100,000. A judgment creditor of this order simply files in the General Accounting Office a certificate of the judgment signed by the clerk and the chief judge of the Court of Claims, and is paid. 28 U. S. C. § 2517 (a). For judgments of this dimension, therefore, there need be no concern about the issuance of execution.

For claims in excess of $100,000, 28 U. S. C. § 2518 directs the Secretary of the Treasury to certify them to Congress once review in this Court has been foregone or sought and found unavailing. This, then, is the domain

570

of our problem, for Art. I, § 9, cl. 7, vests exclusive responsibility for appropriations in Congress,[34] and the Court early held that no execution may issue directed to the Secretary of the Treasury until such an appropriation has been made. *Reeside* v. *Walker,* 11 How. 272, 291.

The problem was recognized in the Congress that created the Court of Claims, where it was pointed out that if ability to enforce judgments were made a criterion of judicial power, no tribunal created under Article III would be able to assume jurisdiction of money claims against the United States. Cong. Globe, 33d Cong., 2d Sess. 113 (1854) (remarks of Senator Stuart). The subsequent vesting of such jurisdiction in the District Courts, pp. 565–566, *supra,* of course bears witness that at least the Congress has not thought such a criterion imperative.

Ever since Congress first accorded finality to judgments of the Court of Claims, it has sought to avoid interfering with their collection. Section 7 of the Act of March 3, 1863, 12 Stat. 765, 766, provided for the payment of final judgments out of general appropriations. In 1877, Congress shifted for a time to appropriating lump sums for judgments certified to it by the Secretary of the Treasury, not in order to question the judgments but to avoid the possibility that a large judgment might exhaust the prior appropriation. Act of March 3, 1877, c. 105, 19 Stat. 344, 347; see 6 Cong. Rec. 585–588 (1877). A study concluded in 1933 found only 15 instances in 70 years when Congress had refused to pay a judgment. Note, 46 Harv. L. Rev. 677, 685–686 n. 63. This historical record, surely more favorable to prevailing parties than that obtaining in private litigation, may well make us doubt whether the capacity to enforce a judgment is always indispensable for the exercise of judicial power.

[34] "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ."

The Court did not think so in *La Abra Silver Mining Co. v. United States,* 175 U. S. 423, 461–462, where the issue was the justiciability under Article III of a declaratory judgment action brought by the United States in the Court of Claims to determine its liability for payment of an award procured by the defendant from an international arbitral commission assertedly through fraud. See also *Nashville, C. & St. L. R. Co.* v. *Wallace,* 288 U. S. 249, 263. Nor has it thought so when faced with the exactly analogous problem presented by suits for money between States in the original jurisdiction. That jurisdiction has been upheld, for example, in *South Dakota* v. *North Carolina,* 192 U. S. 286, 318–321, notwithstanding the Court's recognition of judicial impotence to compel a levy of taxes or otherwise by process to enforce its award. See especially the opinions of Chief Justice Fuller and Chief Justice White at the beginning and inconclusive end of the extended litigation between Virginia and West Virginia, 206 U. S. 290, 319 (1907) and 246 U. S. 565 (1918), in which the Court asserted jurisdiction to award damages for breach of contract despite persistent and never-surmounted challenges to its power to enforce a decree.[35] If this Court may rely on the good faith of state governments or other public bodies to respond to its judgments, there seems to be no sound reason why the Court of Claims may not rely on the good faith of the United States. We conclude that the presence of the United States as a party defendant to suits maintained in the Court of Claims and the Court of Customs and Patent Appeals does not debar those courts from exercising the judicial power provided for in Article III.

[35] See also the intervening opinions and dispositions: 209 U. S. 514; 220 U. S. 1, 36; 222 U. S. 17, 19–20; 231 U. S. 89; 234 U. S. 117; 238 U. S. 202; 241 U. S. 531.

## IX.

All of the business that comes before the two courts is susceptible of disposition in a judicial manner. What remains to be determined is the extent to which it is in fact disposed of in that manner.

A preliminary consideration that need not detain us long is the absence of provision for jury trial of counter-claims by the Government in actions before the Court of Claims. Despite dictum to the contrary in *United States* v. *Sherwood,* 312 U. S. 584, 587, the legitimacy of that nonjury mode of trial does not depend upon the supposed "legislative" character of the court. It derives instead, as indeed was also noted in *Sherwood, ibid.,* from the fact that suits against the Government, requiring as they do a legislative waiver of immunity, are not "suits at common law" within the meaning of the Seventh Amendment. *McElrath* v. *United States,* 102 U. S. 426, 439–440. The Congress was not, therefore, required to provide jury trials for plaintiffs suing in the Court of Claims; the reasonableness of its later decision to obviate the need for multiple litigation precludes a finding that its imposition of amenability to nonjury set-offs was an unconstitutional condition. Cf. *Minneapolis & St. L. R. Co.* v. *Bombolis,* 241 U. S. 211; see 74 Harv. L. Rev. 414, 415 (1960).[36]

The principal question raised by the parties under this head of the argument is whether the matters referred by Congress to the Court of Claims and the Court of Customs and Patent Appeals are submitted to them in a form consonant with the limitation of judicial power to "cases or

---

[36] The provision in 28 U. S. C. § 2503 for Commissioners to take evidence and make preliminary rulings is conformable in all respects with the practice of masters in chancery. For the judicial quality of the proceedings, see the Revised Rules of the Court of Claims, effective December 2, 1957, 140 Ct. Cl. II, 28 U. S. C. App., p. 5237, as amended, *id.* (Supp. III), p. 863.

controversies" imposed by Article III. We may consider first the bulk of jurisdiction exercised by the two courts, reserving for separate treatment in the next section of this opinion two areas which may reasonably be regarded as presenting special difficulty.

"Whether a proceeding which results in a grant is a judicial one," said Mr. Justice Brandeis for a unanimous Court, "does not depend upon the nature of the thing granted, but upon the nature of the proceeding which Congress has provided for securing the grant. The United States may create rights in individuals against itself and provide only an administrative remedy. It may provide a legal remedy, but make resort to the courts available only after all administrative remedies have been exhausted. It may give to the individual the option of either an administrative or a legal remedy. Or it may provide only a legal remedy. [See pp. 549–552, *supra*.] Whenever the law provides a remedy enforceable in the courts according to the regular course of legal procedure, and that remedy is pursued, there arises a case within the meaning of the Constitution, whether the subject of the litigation be property or status." *Tutun* v. *United States,* 270 U. S. 568, 576–577. (Citations omitted.)

It is unquestioned that the Tucker Act cases assigned to the Court of Claims, 28 U. S. C. § 1491, advance to judgment "according to the regular course of legal procedure." Under this grant of jurisdiction the court hears tax cases, cases calling into question the statutory authority for a regulation, controversies over the existence or extent of a contractual obligation, and the like. See generally Schwartz and Jacoby, Government Litigation (tentative ed. 1960), 131–223. Such cases, which account for as much as 95% of the court's work,[37] form the staple

---

[37] In 1950, Tucker Act cases constituted 2,350 of the 2,472 proceedings conducted by the court. Wilkinson, The United States Court of Claims, 36 A. B. A. J. 89, 159 (1950). The percentage may

judicial fare of the regular federal courts. There can be no doubt that, to the "expert feel of lawyers," *United Steelworkers* v. *United States*, 361 U. S. 39, 44, 60 (FRANKFURTER, J., concurring), they constitute cases or controversies.

The balance of the court's jurisdiction to render final judgments may likewise be assimilated to the traditional business of courts generally. Thus the court has been empowered to render accountings,[38] to decide if debts [39] or penalties [40] are due the United States, and to determine the liability of the United States for patent or copyright infringement [41] and for other specially designated torts.[42] In addition, it has been given jurisdiction to review, on issues of law including the existence of substantial evidence, decisions of the Indian Claims Commission.[43] Each of these cases, like those under the Tucker Act, is contested, is concrete, and admits of a decree of a sufficiently conclusive character. See *Aetna Life Insurance Co.* v. *Haworth*, 300 U. S. 227, 240–241.

The same may undoubtedly be said of the customs jurisdiction vested in the Court of Customs and Patent Appeals by 28 U. S. C. § 1541.[44] Contests over classifi-

---

well have been augmented since that time by the extension of Tucker Act jurisdiction to Indian claims accruing after August 13, 1946. 28 U. S. C. § 1505, added by 63 Stat. 102 (1949).

[38] 28 U. S. C. § 1494 (contractors or their sureties); 28 U. S. C. §§ 1496, 2512 (disbursing officers).

[39] R. S. § 5261 (1878), as amended, 45 U. S. C. § 87 (government-aided railroads).

[40] 28 U. S. C. § 1499 (violations of the Eight-Hour Law, 37 Stat. 137 (1912), as amended, 40 U. S. C. § 324).

[41] 28 U. S. C. (Supp. III) § 1498.

[42] 28 U. S. C. §§ 1495, 2513 (wrongful imprisonment); 28 U. S. C. § 1497 (trespass to oyster beds).

[43] 60 Stat. 1049, 1054 (1946), 25 U. S. C. § 70s.

[44] 42 Stat. 15 (1921), as amended, 19 U. S. C. § 169, makes 28 U. S. C. § 1541 applicable as well to the antidumping statute. See also 46 Stat. 735 (1930), as amended, 19 U. S. C. § 1516 (b), (c),

cation and valuation of imported merchandise have long been maintainable in inferior federal courts. Under R. S. § 3011 (1878), suits after protest against the collector were authorized in the circuit courts. *E. g., Greely's Administrator* v. *Burgess,* 18 How. 413; *Iasigi* v. *The Collector,* 1 Wall. 375. When the Customs Administrative Act of 1890 was passed, c. 407, 26 Stat. 131, repealing that section and creating a Board of General Appraisers to review determinations of the collector, a further right of review was provided in the Circuit Courts. See *De Lima* v. *Bidwell,* 182 U. S. 1, 175. This Court took unquestioned appellate jurisdiction from those courts on numerous occasions. *E. g., United States* v. *Ballin,* 144 U. S. 1; *Hoeninghaus* v. *United States,* 172 U. S. 622. It has continued to accept review by certiorari from the Court of Customs Appeals since the jurisdiction of the Circuit Courts was transferred to it in 1909. *E. g., Five Per Cent. Discount Cases,* 243 U. S. 97; *Barr* v. *United States,* 324 U. S. 83. That the customs litigation authorized by § 1541 conforms to conventional notions of case or controversy seems no longer open to doubt.

Doubt has been expressed, however, about the jurisdiction conferred by 28 U. S. C. § 1542 and 60 Stat. 435 (1946), as amended, 15 U. S. C. § 1071, to review application and interference proceedings in the Patent Office relative to patents and trademarks. Parties to those proceedings are given an election to bring a civil action to contest the Patent Office decision in a District Court under 35 U. S. C. §§ 145, 146, or to seek review in the Court of Customs and Patent Appeals under 35 U. S. C. § 141. If the latter choice is made, the Court confines its review to the evidence adduced before the Patent

---

permitting classification or valuation cases to be initiated by protest from a competing domestic manufacturer, after which the importer's consignee may be made a party to suit in the Customs Court, with appeal to the Court of Customs and Patent Appeals.

Office and to the questions of law preserved by the parties; its decision "shall be entered of record in the Patent Office and govern the further proceedings in the case." 35 U. S. C. § 144. The codification "omitted as superfluous" the last sentence in the existing statute: "But no opinion or decision of the court in any such case shall preclude any person interested from the right to contest the validity of such patent in any court wherein the same may be called in question." Act of July 8, 1870, c. 230, § 50, 16 Stat. 198, 205; see Reviser's Note to 35 U. S. C. § 144.

The latter provision was evidently instrumental in prompting a decision of this Court, at a time when review of Patent Office determinations was vested in the Court of Appeals for the District of Columbia, that the ruling called for by the statute was not of a judicial character. *Postum Cereal Co.* v. *California Fig Nut Co.,* 272 U. S. 693, 699. That is the most that the *Postum* holding can be taken to stand for, as *United States* v. *Duell,* 172 U. S. 576, 588–589, had upheld the judicial nature of the review in all other respects.[45] And the continuing vitality of the decision even to this extent has been seriously weakened if not extinguished by the subsequent holding in *Hoover Co.* v. *Coe,* 325 U. S. 79, 88, sustaining the justiciability of the alternative remedy by civil action even though the Court deemed "the effect of adjudication in equity the same as that of decision on appeal." See Kurland and Wolfson, Supreme Court Review of the Court of Customs and Patent Appeals: Patent Office and Tariff Commission Cases, 18 G. W. L. Rev. 192, 194–198 (1950).

---

[45] Curiously, *Duell* was not cited in *Postum,* while the cases that were—*Frasch* v. *Moore,* 211 U. S. 1; *Atkins* v. *Moore,* 212 U. S. 285; *Baldwin Co.* v. *Howard Co.,* 256 U. S. 35—had, as the Court recognized, held only that the statutory scheme of review did not produce a "final judgment" as required by the statute then governing appeals to the Court.

At the time when *Postum* was decided, the proceeding in equity against the Patent Office was cumulative rather than alternative with the review by appeal, and it seems likely that it was this feature of the statute which caused the Court to characterize the judgment of the Court of Appeals as "a mere administrative decision." 272 U. S., at 698. Thereafter Congress made the remedies alternative, Act of March 2, 1927, c. 273, § 11, 44 Stat. 1335, 1336, and it was this amended jurisdiction that it later transferred to the Court of Customs and Patent Appeals, renaming the court in the process. Act of March 2, 1929, c. 488, 45 Stat. 1475.

It may still be true that Congress has given to the equity proceeding a greater preclusive effect than that accorded to decisions of the Court of Customs and Patent Appeals.[46] Even so, that circumstance alone is insufficient to make those decisions nonjudicial. *Tutun* v. *United States,* 270 U. S. 568, decided by the same Court as *Postum* and not there questioned, is controlling authority. For the Court there held that a naturalization proceeding in a Federal District Court was a "case" within the meaning of Article III, even though the Government was empowered by statute [47] to bring a later bill in equity for cancellation of the certificate.

Mr. Justice Brandeis, the author of the *Tutun* opinion, had also prepared the Court's opinion in *United States* v. *Ness,* 245 U. S. 319, which upheld the Government's right to seek denaturalization even upon grounds known to and

---

[46] See Stern and Gressman, Supreme Court Practice (1950), 44–46. But see *Hobart Mfg. Co.* v. *Landers, Frary & Clark,* 26 F. Supp. 198, 202, aff'd *per curiam,* 107 F. 2d 1016; *Battery Patents Corp.* v. *Chicago Cycle Supply Co.,* 111 F. 2d 861, 863; Reviser's Note, 35 U. S. C. § 144.

[47] Naturalization Act of June 29, 1906, c. 3592, § 15, 34 Stat. 596, 601.

asserted unsuccessfully by it in the naturalization court.[48] Proceedings in that court, the opinion explained, were relatively summary, with no right of appeal, whereas the denaturalization suit was plenary enough to permit full presentation of all objections and was accompanied with appeal as of right. 245 U. S., at 326. These differences made it reasonable for Congress to allow the Government another chance to contest the applicant's eligibility.

The decision in *Tutun*, coming after *Ness*, draws the patent and trademark jurisdiction now exercised by the Court of Customs and Patent Appeals fully within the category of cases or controversies. So much was recognized in *Tutun* itself, 270 U. S., at 578, where Mr. Justice Brandeis observed:

> "If a certificate is procured when the prescribed qualifications have no existence in fact, it may be cancelled by suit. 'It is in this respect,' as stated in *Johannessen* v. *United States,* 225 U. S. 227, 238, 'closely analogous to a public grant of land (Rev. Stat., § 2289, etc.,) or of *the exclusive right to make, use and vend a new and useful invention* (Rev. Stat., § 4883, etc.).' " (Emphasis added.)

Like naturalization proceedings in a District Court, appeals from Patent Office decisions under 35 U. S. C. § 144 are relatively summary—since the record is limited to the evidence allowed by that office—and are not themselves subject to direct review by appeal as of right.[49] It

---

[48] For later developments, see *Schneiderman* v. *United States,* 320 U. S. 118, 123–125; *Knauer* v. *United States,* 328 U. S. 654, 671–673; *Chaunt* v. *United States,* 364 U. S. 350.

[49] We intimate no opinion whether 28 U. S. C. § 1256 was intended by Congress to make patent and trademark cases reviewable by certiorari in this Court. See Kurland and Wolfson, Supreme Court Review of the Court of Customs and Patent Appeals, 18 G. W. L. Rev. 192, 194–198 (1950).

was as reasonable for Congress, therefore, to bind only the Patent Office on appeals and to give private parties whether or not participants in such appeals a further opportunity to contest the matter on plenary records developed in litigation elsewhere. This practice but furnishes a further illustration of the specialized jurisdiction of the Court of Customs and Patent Appeals, akin to that of the Commerce Court, in passing upon the consistency with law of expert administrative judgments without undertaking to conclude private parties in nonadministrative litigation. We conclude that the *Postum* decision must be taken to be limited to the statutory scheme in existence before the transfer of patent and trademark litigation to that court.

## X.

We turn finally to the more difficult questions raised by the jurisdiction vested in the Court of Customs and Patent Appeals by 28 U. S. C. § 1543 to review Tariff Commission findings of unfair practices in import trade, and the congressional reference jurisdiction given the Court of Claims by 28 U. S. C. §§ 1492 and 2509. The judicial quality of the former was called into question though not resolved in *Ex parte Bakelite Corp.*, 279 U. S. 438, 460–461,[50] while that of the latter must be taken to have been adversely decided, so far as susceptibility to Supreme Court review is concerned, by *In re Sanborn*, 148 U. S. 222.[51]

[50] Section 316 (c) of the Tariff Act of 1922, c. 356, 42 Stat. 858, 943, involved in *Bakelite,* was reenacted in virtually identical terms by § 337 (c) of the Tariff Act of 1930, 46 Stat. 590, 703, as amended, 19 U. S. C. § 1337 (c).

[51] *Sanborn* involved the departmental reference jurisdiction of the Court of Claims, since repealed by 67 Stat. 226 (1953); but the functions performed by the court in that case were not in substance different from those it still performs on request by Congress.

At the outset we are met with a suggestion by the Solicitor General that even if the decisions called for by these heads of jurisdiction are nonjudicial, their compatibility with the status of an Article III court has been settled by *O'Donoghue* v. *United States,* 289 U. S. 516, 545–548. It is true that *O'Donoghue* upheld the authority of Congress to invest the federal courts for the District of Columbia with certain administrative responsibilities—such as that of revising the rates of public utilities [52]—but only such as were related to the government of the District. See *Pitts* v. *Peak,* 60 App. D. C. 195, 197, 50 F. 2d 485, 487, cited and relied upon in *O'Donoghue,* 289 U. S., at 547–548.[53] To extend that holding to the wholly nationwide jurisdiction of courts whose seat is in the District of Columbia would be to ignore the special importance attached in the *O'Donoghue* opinion to the need there for an independent national judiciary.

---

[52] See *Keller* v. *Potomac Electric Power Co.,* 261 U. S. 428.

[53] *Federal Radio Comm'n* v. *General Electric Co.,* 281 U. S. 464, which sustained the authority of the Court of Appeals for the District of Columbia to render an "administrative" decision respecting the issuance of a radio broadcasting license to a station in Schenectady, New York, was decided at a time when the courts of the District were regarded wholly as legislative courts. *Id.,* at 468.

It is significant that all of the jurisdiction at issue in the *Keller, Postum,* and *General Electric* cases has long since been transformed into judicial business. The change with respect to review of Patent Office decisions took place, as we have seen, p. 577, *supra,* before the transfer of that jurisdiction to the Court of Customs and Patent Appeals. Review of the Public Utilities Commission was restricted to questions of law upon the evidence before the Commission, in the Act of August 27, 1935, § 2, 49 Stat. 882, D. C. Code, 1961, § 43–705. See *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451, 458. And the Act of July 1, 1930, c. 788, 46 Stat. 844, likewise made review of the Radio Commission judicial, as was recognized in *Federal Radio Comm'n* v. *Nelson Bros. Co.,* 289 U. S. 266, 274–278.

The restraints of federalism are, of course, removed from the powers exercisable by Congress within the District. For, as the Court early stated, in *Kendall* v. *United States,* 12 Pet. 524, 619:

> "There is in this district, no division of powers between the general and state governments. Congress has the entire control over the district for every purpose of government; and it is reasonable to suppose, that in organizing a judicial department here, all judicial power necessary for the purposes of government would be vested in the courts of justice."

Thus those limitations implicit in the rubric "case or controversy" that spring from the Framers' anxiety not to intrude unduly upon the general jurisdiction of state courts, see Madison's Notes of the Debates, in II Farrand, Records of the Federal Convention (1911), 45–46, need have no application in the District. The national courts here may, consistently with those limitations, perform any of the local functions elsewhere performed by state courts.[54]

But those are not the only limitations embodied in Article III's restriction of judicial power to cases or con-

---

[54] The D. C. Code, 1961, Tit. 11, c. 5, establishes a special term of the United States District Court as a probate court, whereas the other Federal District Courts have been debarred from exercising such a jurisdiction as one traditionally within the domain of the States. *Byers* v. *McAuley,* 149 U. S. 608, 619. Similarly, the divorce proceedings maintainable under the general jurisdictional grant, D. C. Code, § 11–306; see *Bottomley* v. *Bottomley,* 104 U. S. App. D. C. 311, 262 F. 2d 23, are beyond the ken of the federal courts in the States. *Ohio ex rel. Popovici* v. *Agler,* 280 U. S. 379, 383.

The appointing authority given judges of the District Court to select members of the Board of Education and of the Commission on Mental Health, D. C. Code, §§ 31–101, 21–308, is probably traceable to Art. II, § 2 of the Constitution. See note 10, *supra; Ex parte Siebold,* 100 U. S. 371, 397–398.

582

troversies. The restriction expresses as well the Framers' desire to safeguard the independence of the judicial from the other branches by confining its activities to "cases of a Judiciary nature," see II Farrand, *op cit., supra,* at 430, and in this respect it remains fully applicable at least to courts invested with jurisdiction solely over matters of national import. Our question is whether the independence of either the Court of Claims or the Court of Customs and Patent Appeals has been so compromised by its investiture with the particular heads of jurisdiction described above as to destroy its eligibility for recognition as an Article III court.

The jurisdictional statutes in issue, § 337 of the Tariff Act of 1930 and 28 U. S. C. §§ 1492, 2509, appear to subject the decisions called for from those courts to an extrajudicial revisory authority incompatible with the limitations upon judicial power this Court has drawn from Article III. See, *e. g., Chicago & Southern Air Lines, Inc.,* v. *Waterman S. S. Corp.,* 333 U. S. 103, 113–114; *Hayburn's Case,* 2 Dall. 409. Whether they actually do so is not, however, entirely free from difficulty, and cannot in our view appropriately be decided in a vacuum, apart from the setting of particular cases in which we may gauge the operation of the statutes. For disposition of the present cases, we think it is sufficient simply to note the doubt attending the validity of the jurisdiction, and to proceed on the assumption that it cannot be entertained by an Article III court.

It does not follow, however, from the invalidity, actual or potential, of these heads of jurisdiction, that either the Court of Claims or the Court of Customs and Patent Appeals must relinquish entitlement to recognition as an Article III court. They are not tribunals, as are for example the Interstate Commerce Commission or the Federal Trade Commission, a substantial and integral part of whose business is nonjudicial.

The overwhelming majority of the Court of Claims' business is composed of cases and controversies. See pp. 573–574, *supra*. In the past year, it heard only 10 reference cases, Annual Report of the Administrative Office of the United States Courts (1961), 318; and its recent annual average has not exceeded that figure, Pavenstedt, The United States Court of Claims as a Forum for Tax Cases, 15 Tax L. Rev. 1, 6 n. 23 (1959). The tariff jurisdiction of the Court of Customs and Patent Appeals is of even less significant dimensions. In the past fiscal year, that court disposed of 41 customs cases and 112 patent or trademark cases, but heard no appeals from the Tariff Commission. Annual Report of the Administrative Office of the United States Courts (1961), 318. Indeed we are advised that in all the years since 1922, when the predecessor to § 337 of the Tariff Act was first enacted, the Court of Customs and Patent Appeals has entertained only six such cases.[55] Certainly the status of a District Court or Court of Appeals would not be altered by a mere congressional attempt to invest it with such insignificant nonjudicial business; it would be equally perverse to make the status of these courts turn upon so minuscule a portion of their purported functions.

The Congress that enacted the assignment statute with its accompanying declarations was apprised of the possibility that a re-examination of the *Bakelite* and *Williams* decisions might lead to disallowance of some of these courts' jurisdiction. See 99 Cong. Rec. 8944 (1953) (remarks of Senator Gore); 104 Cong. Rec. 17549 (1958) (remarks of Senator Talmadge). Nevertheless it chose to pass the statute. We think with it that, if necessary, the particular offensive jurisdiction, and not the courts, would fall.

---

[55] Brief on behalf of the chief judge and the associate judges of the United States Court of Customs and Patent Appeals as *amici curiae*, p. 10.

584

CONCLUSIONS.

Since the Court of Claims and the Court of Customs and Patent Appeals are courts created under Article III, their judges—including retired judges, *Booth* v. *United States,* 291 U. S. 339, 350–351—are and have been constitutionally protected in tenure and compensation. Our conclusion, it should be noted, is not an *ex post facto* resurrection of a banished independence. The judges of these two courts have never accepted the dependent status thrust at them by the *Bakelite* and *Williams* decisions. See, *e. g.,* Judge Madden writing for the Court of Claims in *Pope* v. *United States,* 100 Ct. Cl. 375, 53 F. Supp. 570, rev'd, 323 U. S. 1. The factors set out at length in this opinion, which were not considered in the *Bakelite* and *Williams* opinions, make plain that the differing conclusion we now reach does no more than confer legal recognition upon an independence long exercised in fact.

That recognition suffices to dispose of the present cases. For it can hardly be contended that the specialized functions of these judges deprive them of capacity, as a matter of due process of law, to sit in judgment upon the staple business of the District Courts and Courts of Appeals. Whether they should be given such assignments may be and has been a proper subject for congressional debate, *e. g.,* 62 Cong. Rec. 190–191, 207–209 (1921), but once legislatively resolved it can scarcely rise to the dignity of a constitutional question. To be sure, a judge of specialized experience may at first need to devote extra time and energy to familiarize himself with criminal, labor relations, or other cases beyond his accustomed ken. But to elevate this temporary disadvantage into a constitutional disability would be tantamount to suggesting that the President may never appoint to the bench a lawyer whose life's practice may have been devoted to patent, tax, antitrust, or any other specialized

field of law in which many eminently well-qualified lawyers are wont to engage. The proposition will not, of course, survive its statement.

The judgments of the Courts of Appeals are

*Affirmed.*

MR. JUSTICE FRANKFURTER took no part in the decision of this case.

MR. JUSTICE WHITE took no part in the consideration or decision of this case.

MR. JUSTICE CLARK, with whom THE CHIEF JUSTICE joins, concurring in the result.

I cannot agree to the unnecessary overruling of *Ex parte Bakelite Corp.*, 279 U. S. 438 (1929), and *Williams* v. *United States*, 289 U. S. 553 (1933). Both were unanimous opinions by most distinguished Courts,[1] headed in the *Bakelite* case by Chief Justice Taft and in *Williams* by Chief Justice Hughes.

Long before *Glidden* v. *Zdanok* was filed, the Congress had declared the Court of Claims "to be a court established under article III of the Constitution of the United States." Act of July 28, 1953, § 1, 67 Stat. 226. Not that this *ipse dixit* made the Court of Claims an Article III court, for it must be examined in light of the congressional power exercised and the jurisdiction enjoyed, together with the characteristics of its judges. But the 1953 Act did definitely establish the intent of the Congress, which prior to that time was not clear in light of the *Williams* holding 20 years earlier that it was not an Article III court.

---

[1] *Bakelite:* Taft, Holmes, Van Devanter, McReynolds, Brandeis, Sutherland, Butler, Sanford and Stone. *Williams:* Hughes, Van Devanter, McReynolds, Brandeis, Sutherland, Butler, Stone, Roberts and Cardozo.

It is my belief that prior to 1953 the Court of Claims had all of the characteristics of an Article III court—jurisdiction over justiciable matters, issuance of final judgments, judges appointed by the President with consent of the Senate—save as to the congressional reference matters. It was the fact that a substantial portion of its jurisdiction consisted of congressional references that compelled the decision in *Williams* that it was not an Article III court and therefore the salaries of its judges could be reduced.[2] Since that time the Article III jurisdiction of the Court of Claims has been enlarged by including original jurisdiction under several Acts, *e. g.,* suits against the United States for damages for unjust conviction, Act of May 24, 1938, §§ 1–4, 52 Stat. 438, 28 U. S. C. § 1495, and appellate jurisdiction over tort suits against the United States tried in the District Courts, Act of Aug. 2, 1946, § 412 (a)(2), 60 Stat. 844, 28 U. S. C. § 1504, and over suits before the Indian Claims Commission, Act of May 24, 1949, § 89 (a), 63 Stat. 102, 28 U. S. C. § 1505. In addition, the former jurisdiction over questions referred by the Executive branch was withdrawn in 1953. Act of July 28, 1953, § 8, 67 Stat. 226. The result is that practically all of the court's jurisdiction

---

[2] " 'From the outset Congress has required it [the Court of Claims] to give merely advisory decisions on many matters. Under the act creating it all of its decisions were to be of that nature. Afterwards some were to have effect as binding judgments, but others were still to be merely advisory. This is true at the present time.' " *Williams* v. *United States, supra,* at 569 (quoting from *Ex parte Bakelite).*

"Further reflection tends only to confirm the views expressed in the *Bakelite* opinion . . . and we feel bound to reaffirm and apply them. And, giving these views due effect here, we see no escape from the conclusion that if the Court of Customs Appeals is a legislative court, so also is the Court of Claims." *Williams,* at 571. The *Bakelite* decision was posited squarely on the legislative reference function. See *Ex parte Bakelite, supra,* 454–458.

is now comprised of Article III cases. And I read the 1953 Act as unequivocally expressing Congress' intent that this court—the jurisdiction of which was then almost entirely over Article III cases—should be an Article III court, thereby irrevocably establishing life tenure and irreducible salaries for its judges.

It is true that Congress still makes legislative references to the court, averaging some 10 a year. The acceptance of jurisdiction of either executive or legislative references calling for advisory opinions has never been honored by Article III courts. Indeed, this Court since 1793 has consistently refused so to act. Correspondence of the Justices, 3 Johnston, Correspondence and Public Papers of John Jay (1891), 486–489. *Muskrat v. United States,* 219 U. S. 346 (1911). I do not construe the legislative history of the 1953 Act to be so clear as to require the Court of Claims to carry on this function, which appears to be minuscule. On the contrary, the congressional mandate clearly and definitely declared the court "to be a court established under article III." I would carry out that mandate. In my view the Court of Claims, if and when such a reference occurs, should with due deference advise the Congress, as this Court advised the President 169 years ago, that it cannot render advisory opinions.

Likewise I find that the Court of Customs and Patent Appeals has been an Article III court since 1958. It was created by the Congress in 1909 to exercise exclusive appellate jurisdiction over customs cases. Payne-Aldrich Tariff Act of Aug. 5, 1909, 36 Stat. 11, 105–108. At that time these cases were reviewed by Circuit Courts of Appeals—clearly of Article III status—36 Stat. 106, and they have since been considered on certiorari by this Court without suggestion that they were not "cases" in the Article III sense. *E. g., The Five Per Cent. Discount*

*Cases*, 243 U. S. 97 (1917).[3]   The Congress enlarged the jurisdiction of the Court of Customs and Patent Appeals in 1922 to include appeals on questions of law from Tariff Commission findings in proceedings relating to unfair practices in the import trade.   Tariff Act of 1922, 42 Stat. 943, 944.   In 1929 this Court in *Bakelite, supra,* which involved a tariff matter, found these references to be of an advisory nature and on this basis declared the Court of Customs and Patent Appeals to be a legislative rather than an Article III court.   The *Bakelite* decision indicates that this Court was of the impression that the tariff jurisdiction of the Court of Customs and Patent Appeals would be significant.   However, since that time that court has handled but four such references—and only one in the last 27 years.   At about the same time that the *Bakelite* opinion came down, Congress transferred the appellate jurisdiction in patent and trademark cases from the Court of Appeals of the District of Columbia to the Court of Customs and Patent Appeals.   Act of March 2, 1929, §§ 1, 2, 45 Stat. 1475.   Thus, contrary to the apparent assumption in *Bakelite,* the business of that court now consists exclusively of Article III cases—with tariff references practically nonexistent (one in the last 27 years). In view of this evolution of its jurisdiction, I believe the court became an Article III court upon the clear manifestation of congressional intent that it be such.   Act of Aug. 25, 1958, § 1, 72 Stat. 848.

As I have indicated, *supra,* the handling of the tariff references—numbering only 6 in 40 years—is not an Article III court function.   The Congress has declared

---

[3] That its original jurisdiction was in "cases" in the Article III, § 2, sense cannot be questioned.   See *In re Frischer & Co.,* 16 Ct. Cust. App. 191, 198 (1928); *Osborn* v. *Bank of U. S.,* 9 Wheat. 738, 819 (1824); *Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447, 487 (1894); *Tutun* v. *United States,* 270 U. S. 568, 576–577 (1926).

the Court of Customs and Patent Appeals to be an Article III court. It should, therefore, if and when such a case arose, with due deference refuse to exercise such jurisdiction.[4]

I see nothing in the argument that the 1953 and 1958 Acts so changed the character of these courts as to require new presidential appointments. Congress was merely renouncing its power to terminate the functions or reduce the tenure or salary of the judges of the courts. Much more drastic changes have been made without reappointment.[5] And there is no significance to the fact that Judge Jackson, who presided over the Lurk trial, was, not in active status in 1958 when Congress declared his court to be an Article III court. He remained in office as a judge of that court even though retired, cf. *Booth* v. *United States,* 291 U. S. 339 (1934), and his judgeship was controlled by any act concerning the jurisdiction of that court or the status of its judges.

I would affirm.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

The decision in these cases has nothing to do with the character, ability, or qualification of the individuals who sat on assignment on the Court of Appeals in No. 242 and

[4] The validity of Judge Jackson's participation, as the Government points out, might also be sustained under the Act of September 14, 1922, c. 306, § 5, 42 Stat. 837, 839, which provided for the assignment of judges of the Court of Customs Appeals to the courts of the District of Columbia. This Act was on the books when Judge Jackson took his seat on the Court of Customs and Patent Appeals as well as when the *Lurk* case was tried.

[5] Nor does my holding carry any implication that judgments entered prior to the date of these Acts in which judges of these courts participated might be collaterally attacked. *Ex parte Ward,* 173 U. S. 452 (1899).

590

on the District Court[1] in No. 481. The problem is an impersonal one, concerning the differences between an Article I court and an Article III court. My Brother HARLAN calls it a problem of a "highly theoretical nature." Far from being "theoretical" it is intensely practical, for it deals with powers of judges over the life and liberty of defendants in criminal cases and over vast property interests in complicated trials customarily involving the right to trial by jury.

Prior to today's decision the distinction between the two courts had been clear and unmistakable. By Art. I, § 8, Congress is given a wide range of powers, including

---

[1] The District Court of the District of Columbia, like the "inferior courts" established by Congress under Art. III, § 1, of the Constitution, is an Article III court (*O'Donoghue* v. *United States*, 289 U. S. 516), even though it possesses powers that Article III courts could not exercise. Congress, acting under its plenary power granted by Art. I, § 8, to legislate for the District of Columbia, has from time to time vested in the courts of the District administrative and even legislative powers. See, *e. g.*, *Keller* v. *Potomac Electric Co.*, 261 U. S. 428, 440–443 (review of rate making); *Postum Cereal Co.* v. *California Fig Nut Co.*, 272 U. S. 693, 698–701 (patent and trademark appeals); *Federal Radio Comm'n* v. *General Electric Co.*, 281 U. S. 464, 467–468 (review of radio station licensing; cf. *Radio Comm'n* v. *Nelson Bros. Co.*, 289 U. S. 266, 274–278). Congress has also authorized District Court judges to appoint members of the Board of Education. D. C. Code, § 31–101.

In *O'Donoghue* v. *United States, supra*, at 545, the Court said:

"The fact that Congress, under another and plenary grant of power, has conferred upon these courts jurisdiction over non-federal causes of action, or over quasi-judicial or administrative matters, does not affect the question. In dealing with the District, Congress possesses the powers which belong to it in respect of territory within a state, and also the powers of a state."

The eighteenth-century courts in this country performed many administrative functions. See Pound, Organization of Courts (1940), pp. 88–89. The propriety of the union of legislative and judicial powers in a *state* court was assumed in *Prentis* v. *Atlantic Coast Line*, 211 U. S. 210.

the power "to pay the Debts" of the United States and the power to "lay and collect Taxes, Duties, Imposts and Excises." By Art. I, § 8, Congress is also given the power "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers." Pursuant to the latter—the Necessary and Proper Clause—the Court of Claims was created "to pay the Debts"; [2] and the Court of Customs and Patent Appeals was created in furtherance of the collection of duties. My Brother HARLAN shows that the Court of Customs Appeals traces back to the Payne-Aldrich Tariff Act of August 5, 1909, which should be proof enough that it is an administrative court, performing essentially an executive task. [3]

---

[2] "Legislative courts also may be created as special tribunals to examine and determine various matters, arising between the government and others, which from their nature do not require judicial determination and yet are susceptible of it. The mode of determining matters of this class is completely within congressional control. Congress may reserve to itself the power to decide, may delegate that power to executive officers, or may commit it to judicial tribunals.

"Conspicuous among such matters are claims against the United States. These may arise in many ways and may be for money, lands or other things. They all admit of legislative or executive determination, and yet from their nature are susceptible of determination by courts; but no court can have cognizance of them except as Congress makes specific provision therefor. Nor do claimants have any right to sue on them unless Congress consents; and Congress may attach to its consent such conditions as it deems proper, even to requiring that the suits be brought in a legislative court specially created to consider them.

"The Court of Claims is such a court. It was created, and has been maintained, as a special tribunal to examine and determine claims for money against the United States. This is a function which belongs primarily to Congress as an incident of its power to pay the debts of the United States. But the function is one which Congress has a discretion either to exercise directly or to delegate to other agencies." *Ex parte Bakelite Corp.*, 279 U. S. 438, 451–452.

[3] "The Court of Customs Appeals was created by Congress in virtue of its power to lay and collect duties on imports and to adopt any

592

In *Williams* v. *United States*, 289 U. S. 553, the Court in a unanimous decision written by Mr. Justice Sutherland held that the Court of Claims, though exercising judicial power, was an Article I court. And in *Ex parte Bakelite Corp.*, 279 U. S. 438, the Court in a unanimous opinion written by Mr. Justice Van Devanter held the Court of Customs Appeals to be an Article I court. Taft was Chief Justice when *Ex parte Bakelite* was decided. Hughes was Chief Justice when *Williams* v. *United States* was decided. I mention the two regimes that filed the unanimous opinions in those cases to indicate the vintage of the authority which decided them. Their decisions, of course, do not bind us, for they dealt with matters of constitutional interpretation which are always open. Yet no new history has been unearthed to show that the Taft and the Hughes Courts were wrong on the technical, but vitally important, question now presented.

Mr. Justice Van Devanter in *Ex parte Bakelite* marked the line between the Court of Claims and the Court of

appropriate means of carrying that power into execution. The full province of the court under the act creating it is that of determining matters arising between the Government and others in the executive administration and application of the customs laws. These matters are brought before it by appeals from decisions of the Customs Court, formerly called the Board of General Appraisers. The appeals include nothing which inherently or necessarily requires judicial determination, but only matters the determination of which may be, and at times has been, committed exclusively to executive officers. True, the provisions of the customs laws requiring duties to be paid and turned into the Treasury promptly, without awaiting disposal of protests against rulings of appraisers and collectors, operate in many instances to convert the protests into applications to refund part or all of the money paid; but this does not make the matters involved in the protests any the less susceptible of determination by executive officers. In fact their final determination has been at times confided to the Secretary of the Treasury, with no recourse to judicial proceedings." *Ex parte Bakelite Corp.*, *supra*, note 2, at 458.

Customs and Patent Appeals on the one hand and the
District Courts and Courts of Appeals on the other:

> "Those established under the specific power given
> in section 2 of Article III are called constitutional
> courts.  They share in the exercise of the judicial
> power defined in that section, can be invested with
> no other jurisdiction, and have judges who hold office
> during good behavior, with no power in Congress to
> provide otherwise.   On the other hand, those created
> by Congress in the exertion of other powers are
> called legislative courts.   Their functions always are
> directed to the execution of one or more of such
> powers and are prescribed by Congress independently
> of section 2 of Article III; and their judges hold for
> such term as Congress prescribes, whether it be a
> fixed period of years or during good behavior."   *Id.*,
> at 449.

My Brother HARLAN emphasizes that both Judge
Madden of the Court of Claims and Judge Jackson of the
Court of Customs and Patent Appeals "enjoy statutory
assurance of tenure and compensation"; and so they do.
But that statement reveals one basic difference between
an Article III judge and an Article I judge.   The latter's
tenure is *statutory* and *statutory only;* Article I contains
no guarantee that the judges of Article I courts have life
appointments.   Nor does it provide that their salaries may
not be reduced during their term of office.   On the other
hand, the tenure of an Article III judge is during "good
behaviour"; moreover, Article III provides that its judges
shall have a compensation that "shall not be diminished
during their Continuance in Office."   See *O'Malley* v.
*Woodrough,* 307 U. S. 277.   To repeat, there is not a
word in Article I giving its courts such protection in
tenure or in salary.   A constitutional amendment would
be necessary to supply Article I judges with the guaran-

594

tees of tenure and salary that Article III gives its judges. The majority attempts to evade this problem by looking to so-called "Congressional intent" to find the creation of an Article III court. Congress, however, has always understood that it was only establishing Article I courts when it created the Court of Claims and the Court of Customs and Patent Appeals. The tenure it affixed to the judges of those tribunals was of necessity statutory only, as no mandate or requirement of Article I was involved.

The importance of these provisions to the independence of the judiciary needs no argument. Hamilton stated the entire case in The Federalist No. 79 (Lodge ed. 1908), pp. 491–493:

> "Next to permanency in office, nothing can contribute more to the independence of the judges than a fixed provision for their support. The remark made in relation to the President is equally applicable here. In the general course of human nature, *a power over a man's subsistence amounts to a power over his will.* And we can never hope to see realized in practice, the complete separation of the judicial from the legislative power, in any system which leaves the former dependent for pecuniary resources on the occasional grants of the latter. The enlightened friends to good government in every State, have seen cause to lament the want of precise and explicit precautions in the State constitutions on this head. Some of these indeed have declared that *permanent* salaries should be established for the judges; but the experiment has in some instances shown that such expressions are not sufficiently definite to preclude legislative evasions. Something still more positive and unequivocal has been evinced to be requisite. The plan of the convention accordingly has provided that the judges of

the United States 'shall at *stated times* receive for their services a compensation which shall not be *diminished* during their continuance in office.'

"This, all circumstances considered, is the most eligible provision that could have been devised. It will readily be understood that the fluctuations in the value of money and in the state of society rendered a fixed rate of compensation in the Constitution inadmissible. What might be extravagant to-day, might in half a century become penurious and inadequate. It was therefore necessary to leave it to the discretion of the legislature to vary its provisions in conformity to the variations in circumstances, yet under such restrictions as to put it out of the power of that body to change the condition of the individual for the worse. A man may then be sure of the ground upon which he stands, and can never be deterred from his duty by the apprehension of being placed in a less eligible situation. The clause which has been quoted combines both advantages. The salaries of judicial officers may from time to time be altered, as occasion shall require, yet so as never to lessen the allowance with which any particular judge comes into office, in respect to him. . . .

"This provision for the support of the judges bears every mark of prudence and efficacy; and it may be safely affirmed that, together with the permanent tenure of their offices, it affords a better prospect of their independence than is discoverable in the constitutions of any of the States in regard to their own judges.

"The precautions for their responsibility are comprised in the article respecting impeachments. They are liable to be impeached for malconduct by the House of Representatives, and tried by the Senate; and, if convicted, may be dismissed from office, and

disqualified for holding any other. This is the only provision on the point which is consistent with the necessary independence of the judicial character, and is the only one which we find in our own Constitution in respect to our own judges."

We should say here what was said in *Toth* v. *Quarles,* 350 U. S. 11, 17:

". . . the Constitution does not provide life tenure for those performing judicial functions in military trials. They are appointed by military commanders and may be removed at will. Nor does the Constitution protect their salaries as it does judicial salaries. Strides have been made toward making courts-martial less subject to the will of the executive department which appoints, supervises and ultimately controls them. But from the very nature of things, courts have more independence in passing on the life and liberty of people than do military tribunals."

Tenure that is guaranteed by the Constitution is a badge of a judge of an Article III court. The argument that mere *statutory* tenure is sufficient for judges of Article III courts was authoritatively answered in *Ex parte Bakelite Corp., supra,* at 459–460:

". . . the argument is fallacious. It mistakenly assumes that whether a court is of one class or the other depends on the intention of Congress, whereas the true test lies in the power under which the court was created and in the jurisdiction conferred. Nor has there been any settled practice on the part of Congress which gives special significance to the absence or presence of a provision respecting the tenure of judges. This may be illustrated by two citations. *The same Congress that created the Court of Customs Appeals made provision for five additional circuit judges and declared that they should*

*hold their offices during good behavior; and yet the status of the judges was the same as it would have been had that declaration been omitted.* In creating courts for some of the Territories Congress failed to include a provision fixing the tenure of the judges; but the courts became legislative courts just as if such a provision had been included." (Italics added.)

Congress could make members of the Interstate Commerce Commission lifetime appointees. Yet I suppose no one would go so far as to say that a member of the Interstate Commerce Commission could be assigned to sit on the District Court or on the Court of Appeals. But if any agency member is disqualified, why is a member of another Article I tribunal, *viz.,* the Court of Claims or the Court of Customs and Patent Appeals, qualified? No distinction can be drawn based on the functions performed by the Interstate Commerce Commission and those performed by the other two legislative tribunals. In each case some adjudicatory functions are performed.[4] Though the judicial functions of the Interstate Commerce Commission are as distinct as those of the Court of Claims, they nevertheless derive from Article I; and they are functions that Congress can exercise directly or delegate to an agency. *Williams* v. *United States, supra,* pp. 567–571. To make the present decision turn on whether the Court of Claims and the Court of Customs and Patent Appeals perform "judicial" functions is to adopt a false standard. The manner in which the majority reasons exposes the fallacy.

The majority says that once the United States consents to be sued all problems of "justiciability" are satisfied; and

---

[4] The Interstate Commerce Commission has long entered reparation orders directing carriers to pay shippers specified sums of money plus interest for excessive and unreasonable rates. See *Meeker* v. *Lehigh Valley R. Co.,* 236 U. S. 434; II Sharfman, The Interstate Commerce Commission (1931), pp. 387–388.

that Congress has broad powers to convert "moral" obligations into "legal" ones enforceable by "constitutional" courts. The truth is, I think, that the dimensions of Article III can be altered only by the amending process, not by legislation. Congress can create as respects certain claims a limited "justiciability." But if "justiciability" in the "constitutional" sense is involved, then there must be trial by jury assuming, as my Brother HARLAN does, that the claim is for recovery for torts or some other compensable injury. To repeat, it does not advance analysis by calling the function a "judicial" one (see *Pope v. United States*, 323 U. S. 1, 12), for both Article I courts and Article III courts perform functions of that character. The crucial question on this phase of the problems is the manner in which that judicial power is to be exercised.

As Mr. Justice Brandeis made clear in *Tutun* v. *United States*, 270 U. S. 568, 576–577, an administrative remedy may be "judicial." The question here is different; it is whether the procedures utilized by the tribunal must comport with those set forth in the Bill of Rights and in the body of the Constitution. Yet who would maintain that in an administrative action for damages a jury trial was necessary?

Judges of the Article III courts work by standards and procedures which are either specified in the Bill of Rights or supplied by well-known historic precedents. Article III courts are *law courts*, *equity courts*, and *admiralty courts* [5]—all specifically named in Article III. They sit

---

[5] As respects admiralty, Chief Justice Marshall said in *American Ins. Co.* v. *Canter*, 1 Pet. 511, 545:

"If we have recourse to that pure fountain from which all the jurisdiction of the Federal Courts is derived, we find language employed which cannot well be misunderstood. The Constitution declares, that 'the judicial power shall extend to all cases in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority; to

to determine "cases" or "controversies." But Article I courts have no such restrictions. They need not be confined to "cases" or "controversies" but can dispense legislative largesse. See *United States* v. *Tillamooks,* 329 U. S. 40; 341 U. S. 48. Their decisions may affect vital interests; yet like legislative bodies, zoning commissions, and other administrative bodies they need not observe the same standards of due process required in trials of Article III "cases" or "controversies." See *Bi-Metallic Co.* v. *Colorado,* 239 U. S. 441. That is what Chief Justice Marshall meant when he said in *American Ins. Co.* v. *Canter,* 1 Pet. 511, 545–546, that an Article I court (in that case a territorial court) could make its adjudications without regard to the limitations of Article III. On the other hand, as the Court in *O'Donoghue* v. *United States, supra,* at 546, observed, Article III courts could not be endowed with the administrative and legislative powers (or with the power to render advisory opinions) which Article I tribunals or agencies exercise.

In other words, the question, apart from the constitutional guarantee of tenure and the provision against diminution of salary, concerns the functions of the particular tribunal. Article III courts have prescribed for them constitutional standards some of which are in the Bill of Rights, while some (as for example those concerning bills of attainder and *ex post facto* laws) are in the body of the Constitution itself. Article I courts, on the other hand, are agencies of the legislative or executive branch. Thus while Article III courts of law must sit with a jury in suits where the value in controversy exceeds $20, the Court of Claims—an Article I court—is not so confined by the Seventh Amendment. The claims which

---

all cases affecting ambassadors, or other public ministers, and consuls; to all cases of admiralty and maritime jurisdiction.'

"The Constitution certainly contemplates these as three distinct classes of cases . . . ."

600

it hears are claims with respect to which the Government has agreed to be sued. As the Court said in *McElrath* v. *United States,* 102 U. S. 426, 440, since the jurisdiction of the Court of Claims is permissive only, Congress can prescribe the rules and the procedures to be followed in pursuing claims against the Government. Likewise, the Court of Customs Appeals hears appeals that "include nothing which inherently or necessarily requires judicial determination, but only matters the determination of which may be, and at times has been, committed exclusively to executive officers." *Ex parte Bakelite Corp., supra,* at 458.

The judicial functions exercised by Article III courts cannot be performed by Congress nor delegated to agencies under its supervision and control.[6] The bill of

[6] The limitations on Article III courts that distinguish them from Article I courts were stated by Chief Justice Vinson in *National Insurance Co.* v. *Tidewater Co.,* 337 U. S. 582, 629–630, in words that have, I think, general acceptance, though on the precise issue he wrote in dissent:

"In *Keller* v. *Potomac Electric Co.,* 261 U. S. 428 (1923), where this Court had before it an Act under which the courts of the District of Columbia were given revisory power over rates set by the Public Utilities Commission of the District, the appellee sought to sustain the appellate jurisdiction given this Court by the Act on the basis that 'Although Art. III of the Constitution limits the jurisdiction of the federal courts, this limitation is subject to the power of Congress to enlarge the jurisdiction, where such enlargement may reasonably be required to enable Congress to exercise the express powers conferred upon it by the Constitution.' 261 U. S. at 435. There, as here, the power relied upon was that given Congress to exercise exclusive jurisdiction over the District of Columbia, and to make all laws necessary and proper to carry such powers into effect. But this Court clearly and unequivocally rejected the contention that Congress could thus extend the jurisdiction of constitutional courts, citing the note to *Hayburn's Case,* 2 Dall. 409, 410 (1792); *United States* v. *Ferreira,* 13 How. 40, note, p. 52 (1851), and *Gordon* v. *United States,* 117 U. S. 697 (1864). These and other decisions of

attainder is banned by Art. I, § 9. If there is to be punishment, courts (in the constitutional sense) must administer it. As we stated in *United States* v. *Lovett,* 328 U. S. 303, 317:

> "Those who wrote our Constitution well knew the danger inherent in special legislative acts which take away the life, liberty, or property of particular named persons because the legislature thinks them guilty of conduct which deserves punishment. They intended to safeguard the people of this country from punishment without trial by duly constituted courts."

Moreover, when an Article III court of law acts, there is a precise procedure that must be followed:

> "An accused in court must be tried by an impartial jury, has a right to be represented by counsel, he must be clearly informed of the charge against him, the law which he is charged with violating must have been passed before he committed the act charged, he must be confronted by the witnesses against him, he must not be compelled to incriminate himself, he cannot twice be put in jeopardy for the same offense, and even after conviction no cruel and unusual punishment can be inflicted upon him." *Id.,* 317–318.

this Court clearly condition the power of a constitutional court to take cognizance of any cause upon the existence of a suit instituted according to the regular course of judicial procedure, *Marbury* v. *Madison,* 1 Cranch 137 (1803), the power to pronounce a judgment and carry it into effect between persons and parties who bring a case before it for decision, *Muskrat* v. *United States,* 219 U. S. 346 (1911); *Gordon* v. *United States, supra,* the absence of revisory or appellate power in any other branch of Government, *Hayburn's Case, supra; United States* v. *Ferreira, supra,* and the absence of administrative or legislative issues or controversies, *Keller* v. *Potomac Electric Co., supra; Postum Cereal Co.* v. *California Fig Nut Co.,* 272 U. S. 693 (1927)."

On the civil side there is not only the right to trial by jury in suits at common law where the value in controversy exceeds $20 but there is also the mandate of the Seventh Amendment directing that "no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."

Neither of these limitations is germane to litigation in the Court of Claims or in the Court of Customs and Patent Appeals. Those courts, moreover, exercise no criminal jurisdiction, no admiralty jurisdiction, no equity jurisdiction.

As noted, the advisory opinion is beyond the capacity of Article III courts to render. *Muskrat* v. *United States,* 219 U. S. 346. Yet it is part and parcel of the function of legislative tribunals.[7]

Thus I cannot say, as some do, that the distinction between the two kinds of courts is a "matter of language." [8] The majority over and again emphasizes the declaration by Congress that each of the courts in question is an Article III court. It seems that the majority tries to gain momentum for its decision from those congressional declarations. This Court, however, is the expositor of the meaning of the Constitution, as *Marbury* v. *Madison,* 1 Cranch 137, held; and a congressional enactment in the field of Article III is entitled to no greater weight than in other areas. The declarations by Congress that these legislative tribunals are Article III

---

[7] See 28 U. S. C. § 1492, giving the Court of Claims power "to report to either House of Congress on any bill referred to the court by such House." And see 28 U. S. C. §§ 2509, 2510. 28 U. S. C. § 1542 gave the Court of Customs and Patent Appeals a kind of administrative review over certain decisions of the patent office. And see note 2, *supra.*

[8] See H. R. Rep. No. 2348, 84th Cong., 2d Sess., p. 3.

courts [9] would be determinative only if Congress had the power to modify or alter the concepts that radiate throughout Article III and throughout those provisions of the Bill of Rights that specify how the judicial power granted by Article III shall be exercised.

An appointment is made by the President and confirmed by the Senate in light of the duties of the particular office. Men eminently qualified to sit on Article I tribunals or agencies are not picked or confirmed in light of their qualifications to preside at jury trials or to process on appeal the myriad of constitutional and procedural problems involved in Article III "cases" or "controversies." A President who sent a name to the Senate for the Interstate Commerce Commission or Federal Trade Commission might never dream of entrusting the nominee with the powers of an Article III judge. The tasks are so different, the responsibilities and the qualifications so diverse that it is difficult for one who knows the federal system to see how in the world of practical affairs these offices are interchangeable.

In the Senate debate on the Court of Customs Appeals, Senator Cummins stated that the judges who were to man it were to become tariff "experts" whose judicial business would be "confined to the matter of the duties on imports." 44 Cong. Rec. 4185. Senator McCumber, who spoke for the Committee, emphasized the technical nature of the work of those judges and the unique specialization of their work.

> "The law governing the development of the human intellect is such that constant study of a particular question necessarily broadens and expands and intensifies and deepens the mind on that particular sub-

---

[9] See Act of July 28, 1953, 67 Stat. 226 (Court of Claims) ; Act of July 14, 1956, 70 Stat. 532 (Customs Court) ; Act of August 25, 1958, 72 Stat. 848 (Court of Customs and Patent Appeals).

ject.   Any man who has gone over even the cotton schedule will understand how delicate questions will arise; how complex those questions must necessarily be, and how necessary it will be to have judges who will possess technical knowledge upon that subject; and a technical knowledge can only be obtained by a constant daily study of those questions.   For that second reason it was thought best to have a court whose whole attention, whose whole life work, should be given to that particular subject."   *Id.,* at 4199.

Could there be any doubt that the late John J. Parker, rejected by the Senate for this Court, would have been confirmed for one of these Article I courts?

It is said that Congress could separate law and equity and create federal judges who, though Article III judges, sit entirely on the equity side.   If Congress can do that, it is said that Congress can divide up all judicial power as it chooses and by making tenure permanent allow judges to be assigned from an Article I to an Article III court.   The fact that Article III judicial power may be so divided as to produce judges with no experience in the trial of jury cases or in the review of them on appeal is no excuse for allowing legislative judges to be imported into the important fields that Article III preserves and that are partly safeguarded by the Bill of Rights and partly represented by ancient admiralty practice [10] and equity procedures.   Federal judges named to Article III courts are picked in light of the functions entrusted to them.   No one knows whether a President would have appointed to an Article III court a man he named to an Article I court.

My view is that we subtly undermine the constitutional system when we treat federal judges as fungible.   If members of the Court of Claims and of the Court of Cus-

---

[10] See *The Lottawanna,* 21 Wall. 558, 575; *The Osceola,* 189 U. S. 158.

toms and Patent Appeals can sit on life-and-death cases in Article III courts, so can a member of any administrative agency who has a *statutory* tenure that future judges sitting on this Court by some mysterious manner may change to constitutional tenure. With all deference, this seems to me to be a light-hearted treatment of Article III functions.[11]   Men of highest quality chosen as Article I judges might never pass muster for Article III courts when tested by their record of tolerance for minori-

---

[11] The Court does great mischief in today's opinions.   The opinion of my Brother HARLAN stirs a host of problems that need not be opened.   What is done will, I fear, plague us for years.

First, that opinion cites with approval *Ex parte McCardle,* 7 Wall. 506, in which Congress withdrew jurisdiction of this Court to review a *habeas corpus* case that was *sub judice,* and then apparently draws a distinction between that case and *United States* v. *Klein,* 13 Wall. 128, where such withdrawal was not permitted in a property claim. There is a serious question whether the *McCardle* case could command a majority view today.   Certainly the distinction between liberty and property (which emanates from this portion of my Brother HARLAN's opinion) has no vitality even in terms of the Due Process Clause.

Second, *Postum Cereal Co.* v. *California Fig Nut Co.,* 272 U. S. 693, is apparently overruled.   Why this is done is not apparent.   That case ruled on the question whether a ruling on a Patent Office determination was "judicial."   Whether it was or not is immaterial because, as already noted, Article I courts, like Article III courts, exercise "judicial" power.   The only relevant question here is whether a court that need not follow Article III procedures is nonetheless an Article III court.

Third, it is implied that Congress could vest the lower federal courts with the power to render advisory opinions.   The character of the District Court in the District of Columbia has been differentiated from the other District Courts by *O'Donoghue* v. *United States, supra,* in that the former is, in part, an agency of Congress to perform Article I powers.   How Congress could transform regular Article III courts into Article I courts is a mystery.   Certainly we should not decide such an important issue so casually and so unnecessarily.

ties and for their respect of the Bill of Rights—neither of which is as crucial to the performance of the duties of those who sit in Article I courts as it is to the duties of Article III judges.

In sum, judges who do not perform Article III functions, who do not enjoy *constitutional* tenure and whose salaries are not *constitutionally* protected against diminution during their term of office cannot be Article III judges.

Judges who perform "judicial" functions on Article I courts do not adjudicate "cases" or "controversies" in the sense of Article III. They are not bound by the requirements of the Seventh Amendment concerning trial by jury.

Judges who sit on Article I courts are chosen for administrative or allied skills, not for their qualifications to sit in cases involving the vast interests of life, liberty, or property for whose protection the Bill of Rights and the other guarantees in the main body of the Constitution, including the ban on bills of attainder and *ex post facto* laws, were designed. Judges who might be confirmed for an Article I court might never pass muster for the onerous and life-or-death duties of Article III judges.

For these reasons I would reverse the judgments below.